669 F.2d 366
 Fed. Sec. L. Rep. P 98,399
MOBIL CORPORATION, Plaintiff-Appellant,
v.
MARATHON OIL COMPANY, Harold D. Hoopman, Neil A. Armstrong,
Charles H. Barre, Victor G. Beghini, James A. D. Geier,
Elmer A. Graham, Jack H. Herring, W. E. Swales, Raymond C.
Tower, Robert G. Wingerter and USS, Inc., Defendants-Appellees.
 No. 81-3711.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 17, 1981.
Decided Dec. 23, 1981.
 
 John C. Elam and Thomas B. Ridgley, Vorys, Sater, Seymour & Pease, Columbus, Ohio, Walter L. Stratton, Thomas R. Trowbridge, III, Donovan, Leisure, Newton & Irvine, Marc P. Cherno, Sheldon Raab, P. C., Fried, Frank, Harris, Shriver & Jacobson, New York City, for plaintiff-appellant.
 John J. Chester, John W. Zeiger, Jones, Day, Reavis & Pogue, James L. Graham, Graham, Dutro & Nemeth, William D. Ginn, Thompson, Hine & Flory, Columbus, Ohio, for defendants-appellees.
 Before EDWARDS, Chief Judge and ENGEL and MERRITT, Circuit Judges.
 ENGEL, Circuit Judge.
 
 
 1
 On October 30, 1981, Mobil Corporation ("Mobil") announced its intention to purchase up to 40 million outstanding common shares of stock in Marathon Oil Company ("Marathon") for $85 per share in cash. Mobil conditioned that purchase upon receipt of at least 30 million shares, just over one-half of the outstanding shares. It further stated its intention to acquire the balance of Marathon by merger following its purchase of those shares.
 
 
 2
 Marathon directors were concerned about the effects of a merger with Mobil, and they immediately held a board meeting. The directors determined that, together with consideration of other alternatives, they would seek a "white knight"-a more attractive candidate for merger.
 
 
 3
 On November 1, 1981, Marathon filed an antitrust suit against Mobil in the United States District Court for the Northern District of Ohio, claiming that a merger between Marathon and Mobil would violate section 7 of the Clayton Act, 15 U.S.C. § 18. Marathon Oil Co. v. Mobil Corporation, 530 F.Supp. 315 (N.D.Ohio). The district court initially granted Marathon's request for a temporary restraining order, which allowed Mobil to receive tenders but precluded it from purchasing shares pending resolution of Marathon's application for a preliminary injunction. The court invited Marathon to continue its search for a white knight.
 
 
 4
 Negotiations developed between Marathon and several companies. Allied Industries sought to offer to purchase shares on the condition that Marathon buy certain Allied property to finance Allied's subsequent tender offer. Gulf Oil considered making an offer conditioned on a stock option for ten million shares. United States Steel Corporation ("U.S. Steel") indicated its interest, and on November 18, 1981, offered what it termed a "final proposal" to be acted upon that day. By that proposal U.S. Steel offered $125 per share for 30 million shares of Marathon stock, with a plan for a follow-up merger with its subsidiary, U.S.S. Corporation ("USS").
 
 
 5
 The Marathon directors voted to recommend the U.S. Steel offer to the shareholders on November 18, 1981. Marathon, U. S. Steel and USS executed a formal merger agreement on that day. USS made its tender offer on November 19, 1981. Both USS and Marathon filed the appropriate documents with the Securities Exchange Commission.[1]
 
 
 6
 The USS offer, and subsequently the merger agreement, had two significant conditions. First, they required a present, irrevocable option to purchase ten million authorized but unissued shares of Marathon common stock for $90 per share ("stock option"). These shares equalled approximately 17% of Marathon's outstanding shares. Next, they required an option to purchase Marathon's 48% interest in oil and mineral rights in the Yates Field for $2.8 billion. ("Yates Field option"). The latter option could be exercised only if USS's offer did not succeed and if a third party gained control of Marathon. Thus, in effect, a potential competing tender offeror could not acquire Yates Field upon a merger with Marathon.
 
 
 7
 The value of Yates Field to Marathon and to potential buyers is significant; Marathon has referred to the field as its "crown jewel." As Judge Kinneary has indicated, it is viewed as an enormous resource:
 
 
 8
 One of the world's most remarkable oil fields is the Yates field in Pecos County (of the Permian basin province of West Texas). Producing from an unusually prolific and highly permeable reservoir rock, under natural hydraulic pressure, the potential production of 313 wells distributed over 17,000 acres in this field was in 1929 estimated to be in excess of 5 million bbl. per day. This was more than the total daily production of all United States fields; however, production has been drastically curtailed. (Footnote omitted.)
 
 
 9
 Mobil Corporation v. Marathon Oil Company, et al., C-2-81-1402 at 27 (S.D.Ohio December 7, 1981), quoting L.C. Uren, Petroleum Production Engineering (1950) quoted at p.5 of the First Boston Corporation, Yates Field: Another Look (August 14, 1980). Judge Kinneary observed the unique characteristics of the Yates Field:
 
 
 10
 (E)ven though the Yates Field has been producing oil for more than fifty years, petroleum engineers consider the field to be in the intermediate state of depletion, that is, they expect the field to continue producing oil for ninety years; in that there are between 3 and 3.5 billion barrels of oil still in place, the Yates Field holds the promise of providing additional reserves of oil that could be recovered; and cumulative production, as of the date of the report, accounted for only 39 percent of the conservatively estimated recoverable reserves of 2.0 billion barrels.
 
 
 11
 (One expert) estimated total recoverable reserves of 565 million barrels ... (although 150 million barrels) were potential reserves and their recovery might not occur.
 
 
 12
 Mobil Corp. v. Marathon Co., C-2-81-1402 at 27-28.
 
 
 13
 The importance of Yates to a potential tender offeror is illustrated by the fact that both Gulf Oil and Allied indicated that they would propose a tender offer only upon assurances that they would have an option to buy Marathon's interest in the Yates Field. Such requests are a recent but recurring phenomenon in connection with tender offers. See, e.g., Conoco, Inc. v. Mobil Oil Corp., No. 81-4787 (S.D.N.Y. Aug. 4, 1981).
 
 
 14
 Following this agreement, Mobil filed suit in the United States District Court for the Southern District of Ohio, seeking to enjoin the exercise of the options and any purchase of shares in accordance with the tender offer. Named as defendants were Marathon, its directors, and USS. Mobil alleged that the options granted to USS served as a "lock-up" arrangement to defeat any competitive offers of Mobil or third parties, thereby constituting a "manipulative" practice "in connection with a tender offer," in violation of section 14(e) of the Williams Act, 15 U.S.C. § 78n(e). It claimed further that Marathon failed to disclose material information regarding the purpose of the options to its shareholders, also in violation of section 14(e). It also complained of various violations of state law: Marathon acted in breach of its fiduciary duties; it violated Ohio Rev. Code § 1701.76 by selling "all or substantially all" of its assets without shareholder approval;[2] and it effected transactions outside the scope of any legitimate corporate purpose.
 
 
 15
 On November 24, 1981, Judge Kinneary granted in part Mobil's motion for a temporary restraining order, prohibiting Marathon and USS from taking any action in connection with the tender offer or the Yates Field option agreement. Mobil announced a new tender offer on November 25, 1981, offering to purchase at least 30 million common shares of Marathon at $126 per share in cash. This offer was conditioned on a finding that the USS stock option and the Yates Field option were invalid. Mobil reserved a right to waive these conditions and thereafter limit its purchase to less than fifty percent of the shares outstanding. Mobil again indicated its intention to merge with Marathon if the tender offer were successful, proposing to purchase remaining shares with Mobil debentures having a value of $90 in cash.
 
 
 16
 Following that offer, Judge Kinneary considered Mobil's application for a preliminary injunction. In an opinion dated December 7, 1981, he denied a preliminary injunction on the grounds that the test enunciated in Mason County Medical Ass'n v. Knebel, 563 F.2d 256 (6th Cir. 1977), had not been satisfied. This appeal followed. Because there appears to be a substantial likelihood that Mobil will succeed on its claim that execution of the Yates Field and stock options are "manipulative acts or practices, in connection with (a) tender offer" in violation of section 14(e), 15 U.S.C. § 78n(e)[3], we conclude that a consideration of the Mason County criteria required the grant of preliminary injunctive relief, and accordingly, we reverse.
 
 I.
 
 17
 As Judge Kinneary stated, the factors to consider in evaluating whether a preliminary injunction will issue have been outlined in Mason County Medical Ass'n v. Knebel, 563 F.2d 256, 261 (6th Cir. 1977):
 
 
 18
 1. Whether the plaintiff has shown a strong or substantial likelihood or probability of success on the merits;
 
 
 19
 2. Whether the plaintiff has shown irreparable injury;
 
 
 20
 3. Whether the issuance of a preliminary injunction would cause substantial harm to others;
 
 
 21
 4. Whether the public interest would be served by issuing the preliminary injunction.
 
 
 22
 Judge Kinneary found that Mobil made a showing with regard to the last three factors. He stated:
 
 
 23
 Mobil has made a sufficient showing that irreparable harm may be incurred if preliminary injunctive relief is denied. Even should Mobil be successful in acquiring more than 50 percent of the equity interest of Marathon through direct competitive bidding against USS, Inc., the Yates Field option agreement between USS, Inc. and Marathon could be exercised by USS, Inc., thereby effectively destroying any chance that Mobil might have to acquire Marathon with its Yates Field interest intact. Further, the present Marathon shareholders also stand to suffer irreparable injury if, as alleged, the defendants have failed to disclose material facts regarding the package of agreements between Marathon and USS, Inc., in that they will be forced to make irrevocable investment decisions without the benefit of adequate information. Finally, if interim injunctive relief were denied and Mobil later prevailed at trial on its claim under the Williams Act, formulating an adequate remedy at that time, after the effectuation of a USS, Inc.-Marathon merger, might be difficult or impossible.
 
 
 24
 The Court also concludes that the issuance of a preliminary injunction would not unduly cause substantial harm to others. Defendant USS, Inc. asserts that the issuance of the injunction would prejudice USS, Inc. in the minds of Marathon shareholders, and discourage them from tendering shares to USS, Inc., to the detriment of both the shareholders and USS, Inc. Defendant USS, Inc.'s Memorandum in Opposition to Preliminary Injunction, at 34-35. The Court finds this argument tenuous, and concludes that test number three creates no obstacle to the issuance of interim injunctive relief.
 
 
 25
 Finally, the Court believes that, if it should find that plaintiff has shown a strong or substantial likelihood of success on the merits, the issuance of a preliminary injunction would be in the public interest. There is a clear and overriding public interest in having influential business enterprises comply with legislation and legal principles designed to protect investors in the marketplace.
 
 
 26
 To summarize, the Court concludes that a preliminary injunction would be appropriate if plaintiff can show a strong or substantial likelihood of success on the merits of its claims.
 
 
 27
 Mobil Corp. v. Marathon, et al., C-2-81-1402 at 32-34 (citations and footnotes omitted). The defendants do not dispute these findings on appeal.
 
 
 28
 Judge Kinneary nonetheless denied the motion for preliminary injunction because he determined that Mobil had not demonstrated a "substantial likelihood of success on the merits." He found that the disclosures were in accord with section 14(e) requirements. He found further that the state law claims were not substantial in light of Marathon's good faith in connection with the tender offer negotiations. Judge Kinneary also rejected the argument that execution of the Yates Field and stock options could be manipulative acts in violation of section 14(e). We disagree with his finding, and we now turn to a consideration of that question.
 
 II.
 
 29
 Although the issue has not been raised by either party, out of an abundance of caution we believe it necessary to determine whether Mobil has a private cause of action for injunctive relief under section 14(e) of the Williams Act. See California v. Sierra Club, 451 U.S. 287, 101 S.Ct. 1775, 1781, 68 L.Ed.2d 101 (1981). But see Burks v. Lasker, 441 U.S. 471, 476 n.5, 99 S.Ct. 1831, 1836 n.5, 60 L.Ed.2d 404 (1979). In Piper v. Chris-Craft, Inc., 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), the Supreme Court in an opinion by Chief Justice Burger held that a defeated tender offeror (Chris-Craft) did not have a private cause of action for damages against the successful bidder (Bangor Punta) and the target company (Piper). The Court, however, carefully limited its consideration to whether money damages could be recovered. It expressly reserved the question of "whether as a general proposition a suit in equity for injunctive relief ... would lie in favor of a tender offeror under ... § 14(e) ...." Id. at 47 n.33, 97 S.Ct. at 952 n.33. This open question has not been resolved by the Supreme Court or by this circuit, although other courts faced with the issue have found that such a cause of action exists.[4] After an examination of the Piper analysis, a consideration of the distinctions between damage actions and injunctive actions, and a recognition of the special problems associated with the dynamics of tender offer battles, we agree with these courts and hold that a tender offeror has an implied cause of action under the Williams Act to obtain timely injunctive relief for violations of section 14(e).
 
 
 30
 Mobil argues that it is maintaining this action because of its status as a Marathon shareholder. Because Mobil is a hostile tender offeror, we do not agree that Mobil may assert its claims under the Williams Act as a shareholder. In Piper, the Supreme Court rejected the notion that a defeated tender offeror could assert injury using shareholder status. Chief Justice Burger stated:
 
 
 31
 It is clear ... that Chris-Craft has not asserted standing under § 14(e) as a Piper shareholder. The reason is not hard to divine. As a tender offeror actively engaged in competing for Piper stock, Chris-Craft was not in the posture of a target shareholder confronted with the decision of whether to tender or retain its stock. Consequently, Chris-Craft could scarcely have alleged a need for disclosures mandated by the Williams Act. In short, the fact that Chris-Craft necessarily acquired Piper stock as a means of taking over Piper adds nothing to its § 14(e) standing arguments.
 
 
 32
 430 U.S. at 35-36, 97 S.Ct. at 946. Similarly, Mobil is not trying to sell its Marathon stock. It has no interest, as an ordinary shareholder would, in trying to raise the price of Marathon stock. Thus, Mobil cannot assert that it was injured as a shareholder by the Marathon-USS options. Accordingly, the issue now squarely before us is whether Mobil, as a tender offeror, may maintain an action for an injunction.
 
 
 33
 Whether Congress intended a cause of action to be implied from legislation is a question of statutory construction. Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). In Piper, the Court examined the statutory scheme and legislative history in order to identify the legislative purpose of the Williams Act and concluded that "the sole purpose of the Williams Act was the protection of investors who are confronted with a tender offeror." Piper, supra, 430 U.S. at 35, 97 S.Ct. at 946. With that purpose in mind, the Court proceeded to evaluate the Williams Act under the four-part test set forth in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). Therefore, in the instant case, we must also examine the Cort factors to determine whether Congress in the Williams Act intended to grant an implied cause of action for injunctive relief to a tender offeror.
 
 
 34
 The first Cort factor is whether the plaintiff is "one of the class for whose especial benefit the statute was enacted." Id. at 78, 95 S.Ct. at 2087 (emphasis in original). As a tender offeror, Mobil would not appear to be the intended beneficiary of the Act. We believe, however, that we can look to the practical realities of this type of action and determine that a cause of action is necessary to aid the shareholders of Marathon and to prevent violations of the Williams Act. A preliminary injunction against manipulative practices would be the only means of preserving the free, informed choice of shareholders that the Williams Act was designed to protect. As the Supreme Court acknowledged in Piper, "in corporate control contests the stage of preliminary injunctive relief, rather than post-contest lawsuits, 'is the time when relief can best be given.' " Piper v. Chris-Craft, supra, 430 U.S. at 42, 97 S.Ct. at 949. In a tender offer battle, events occur with explosive speed and require immediate response by a party seeking to enjoin the unlawful conduct. Issues such as incomplete disclosure and manipulative practices can only be effectively spotted and argued by parties with complete knowledge of the target, its business, and others in the industry. The tender offeror has frequently made intensive investigations before deciding to commence its offer, and may often be the only party with enough knowledge and awareness to identify nondisclosure or manipulative practices in time to obtain a preliminary injunction.
 
 
 35
 The second factor in Cort is whether there was "any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one." Cort v. Ash, supra, 422 U.S. at 78, 95 S.Ct. at 2087. In Piper, the Court concluded that the legislative history of the Williams Act showed:
 
 
 36
 (T)he narrow intent to curb the unregulated activities of tender offerors. The expression of this purpose, which pervades the legislative history, negates the claim that tender offerors were intended to have additional weapons in the form of an implied cause of action for damages, particularly if a private damages claim confers no advantage on the expressly protected class of shareholder-offerees, a matter we discuss later.
 
 
 37
 Piper v. Chris-Craft, 430 U.S. at 38, 97 S.Ct. at 947 (emphasis added).
 
 
 38
 On the other hand, an injunctive action by a tender offeror has significantly different effects than a damage action. First, clear benefit is derived by the shareholders of the target. An injunction would protect the Marathon shareholders from making their decisions whether to sell without full information. As such, it furthers the purpose of the Williams Act. Second, an injunctive action does not tip the balance in favor of one tender offeror. This type of action serves merely to prevent the manipulative practices at which the Williams Act was aimed without deterring management or competing offerors from engaging in the battle.
 
 
 39
 The third Cort factor requires a determination that the existence of a private remedy is "consistent with the underlying purpose of the legislative scheme." Cort v. Ash, supra, 422 U.S. at 78, 95 S.Ct. at 2087. In Piper, the Court concluded:
 
 
 40
 Although it is correct to say that the $36 million damages award indirectly benefits those Piper shareholders who became Chris-Craft shareholders when they accepted Chris-Craft's exchange offer, it is equally true that the damages award injures those Piper shareholders who exchanged their shares for Bangor Punta's stock and who, as Bangor Punta shareholders, would necessarily bear a large part of the burden of any judgment against Bangor Punta. The class sought to be protected by the Williams Act are the shareholders of the target corporation; hence it can hardly be said that their interests as a class are served by a judgment in favor of Chris-Craft and against Bangor Punta.
 
 
 41
 Piper v. Chris-Craft, supra, 430 U.S. at 39, 97 S.Ct. at 948 (emphasis in original). The injunctive action in the instant case, however, would have very different effects. It would protect all Marathon shareholders by preventing management or competing tender offerors from failing to disclose fully or from using manipulative tactics. Because of the unique ability of Mobil to act quickly while armed with information necessary to prove any section 14(e) violations, this injunctive action may often be the only means to provide adequate assurance that Marathon's shareholders have a fully informed, free choice. Moreover, because no monetary loss is threatened for one who inadvertently violates the Williams Act, an action for an injunction does not pose the danger of deterring future offers.
 
 
 42
 In the fourth and final Cort factor, we must determine whether "the cause of action (is) one traditionally relegated to state law." Cort v. Ash, supra, 422 U.S. at 78, 95 S.Ct. at 2087. In Piper, the Supreme Court found that a tender offeror had a common law cause of action for damages under principles of interference with a prospective commercial advantage. Piper v. Chris-Craft, supra, 430 U.S. at 40-41, 97 S.Ct. at 948-949. While such an action may be an effective common law alternative for a damage action, we do not believe that the common law has traditionally provided an injunctive remedy that would effectively protect Marathon shareholders from nondisclosure or manipulation by the parties in the bidding. Judge Kinneary in this case concluded that Mobil could assert an action on behalf of the Marathon shareholders under the common law principles of breach of fiduciary duty. This common law action, however, is by no means adequate to serve as a substitute for an action under section 14(e). As we find in section III of this opinion, manipulation under the Williams Act cannot be justified by the good faith performance of fiduciary duties. It follows, therefore, that Mobil's cause of action for an injunction under section 14(e) does not have an effective counterpart under the traditional common law principles.
 
 
 43
 Thus, we conclude after an examination of the four factors of Cort v. Ash that Mobil has an implied cause of action under section 14(e) to obtain an injunction against Marathon and USS for failure to make proper disclosure and employment of manipulative practices. In reaching this conclusion regarding Congress' intent, we are mindful that as a general rule the Supreme Court has cautioned against the implication of private causes of action under the securities laws,[5] but we also recognize four special circumstances of this case. First, the action is one for a preliminary injunction which, as noted by Chief Justice Burger in Piper, is at the stage "when relief can best be given." 430 U.S. at 42, 97 S.Ct. at 949. Second, the inherent nature of tender offer litigation requires a plaintiff to possess a large amount of data and information in order to challenge successfully Williams Act violations during the short time frame at hand. Third, the relief sought by Mobil is injunctive. Because a court may structure its remedy on a case-by-case basis, this satisfies the concern of the Court in Piper "that shareholder protection ... can more directly be achieved with other, less drastic means more closely tailored to the congressional goal underlying the Williams Act." 430 U.S. at 40, 97 S.Ct. at 948. Finally, although it is apparent from our decision in Marathon Oil Co. v. Mobil Corp., 669 F.2d 378 (6th Cir. 1981), decided concurrently herewith, that Mobil has suffered a further setback in its effort to acquire control of Marathon, its offer is still outstanding and its capability of ultimately prevailing in the companion litigation has not at this stage been irrevocably foreclosed. Its continuing interest in the controversy assures a full and fair development of the issue in this action.
 
 III.
 
 44
 Having determined that Mobil has an implied cause of action under the Williams Act, we now consider Mobil's claim that the Yates Field and stock options granted by Marathon to USS, the wholly owned subsidiary of U.S. Steel, constitute a "manipulative act or practice" in connection with the USS tender offer of November 19, 1981, in violation of section 14(e). Section 14(e) provides:
 
 
 45
 It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.
 
 
 46
 15 U.S.C. § 78n(e) (emphasis added). The district court found no substantial likelihood of success by Mobil on the merits of this claim, holding that it "amounts to no more than a claim that the Marathon directors acted unfairly and breached their fiduciary (duty) to Marathon and its shareholders," and as such fails to state a cause of action under section 14(e). The district court relied on Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), in which the Supreme Court held that a mere breach of corporate fiduciary duty does not violate section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j. We believe the district court's interpretation of the Santa Fe case and its characterization of Mobil's claim as nothing more than a breach of fiduciary duty were erroneous.
 
 
 47
 Santa Fe involved a claim under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and S.E.C. Rule 10b-5, 17 C.F.R. § 240.10b-5 (1976). Section 10(b) concerns the sale and purchase of securities rather than tender offers, but its anti-manipulation language is similar to that of section 14(e), and provides:
 
 
 48
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange-
 
 
 49
 To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 
 
 50
 Santa Fe held that a mere allegation of unfair treatment of minority shareholders, corporate mismanagement, or breach of corporate fiduciary duty by majority shareholders or corporate directors does not state a cause of action under section 10(b), and particularly that such conduct, standing alone, does not constitute a "manipulative device or contrivance" under the statute. 430 U.S. at 474-77, 97 S.Ct. at 1301.
 
 
 51
 Although Mobil alleges a breach of fiduciary duty by the Marathon directors as one of its pendent state law claims, this claim is not the only basis upon which it complains. We offer no opinion regarding the merits of the fiduciary duty claim, but we conclude that the Yates Field option and the stock option individually and together are "manipulative" as that term is used in section 14(e).
 
 
 52
 The term "manipulative" is not defined in either the Securities Exchange Act or the Williams Act. See, e.g., 15 U.S.C. § 78c. "Manipulation" in securities markets can take many forms, see, e.g., 15 U.S.C. §§ 78i, 78j (proscribing certain forms of manipulation), but the Supreme Court has recently indicated that manipulation is an affecting of the market for, or price of, securities by artificial means, i.e., means unrelated to the natural forces of supply and demand.
 
 
 53
 Use of the word "manipulative" is especially significant. It is and was virtually a term of art when used in connection with securities markets. It connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.
 
 
 54
 Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976) (footnote omitted).
 
 
 55
 "Manipulation" is "virtually a term of art when used in connection with securities markets." Ernst & Ernst, 425 U.S., at 199. The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.
 
 
 56
 Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 476, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977). In our view, it is difficult to conceive of a more effective and manipulative device than the "lock-up" options employed here, options which not only artificially affect, but for all practical purposes completely block, normal healthy market activity and, in fact, could be construed as expressly designed solely for that purpose.
 
 
 57
 The types of options demanded and received by USS in this case are relatively new to the world of tender offer takeover contests, and we are unaware of any Supreme Court or Court of Appeals case confronting the question of whether these particular techniques are "manipulative" within the meaning of section 14(e) of the Williams Act. However, courts have recognized that the term "manipulative" must remain flexible in the face of new techniques which artificially affect securities markets. "No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices." Santa Fe Industries, Inc. v. Green, supra, 430 U.S. at 477, 97 S.Ct. at 1302 (Section 10(b)). A similar observation was made regarding the Commodity Exchange Act, 7 U.S.C. §§ 9, 13, which prohibits manipulation of commodities market prices:
 
 
 58
 The methods and techniques of manipulation are limited only by the ingenuity of man. The aim must be therefore to discover whether conduct has been intentionally engaged in which has resulted in a price which does not reflect basic forces of supply and demand.
 
 
 59
 Cargill, Inc. v. Hardin, 452 F.2d 1154, 1163 (8th Cir. 1971), cert. denied, 406 U.S. 932, 92 S.Ct. 1770, 32 L.Ed.2d 135 (1972).
 
 
 60
 We are of the opinion that under the circumstances of this particular case, Mobil has shown a sufficient likelihood of ultimately establishing that the Yates Field option and the stock option had the effect of creating an artificial price ceiling in the tender offer market for Marathon common shares, and that the options therefore are "manipulative acts or practices" in connection with a tender offer in violation of section 14(e) of the Williams Act.
 
 
 61
 There is ample evidence in the record to support Judge Kinneary's finding that Marathon's Yates Field interest is a unique and significant asset. We believe there is also sufficient evidence in the record to indicate that this asset is a very important attraction to Mobil and other potential bidders for control of Marathon. The Yates Field option which USS demanded and received in connection with its tender offer of $125 per share greatly dampens the demand by Mobil and other potential bidders in the tender offer market, because a successful takeover by any bidder other than USS will give USS the right to exercise its option and purchase the Yates Field interest for $2.8 billion. This presents a significant threat to other bidders that even if they gain control of Marathon they will lose the Yates Field oil reserves.
 
 
 62
 The district court found that the $2.8 billion which Marathon would receive from USS in exchange for the Yates Field oil reserves is a fair price, but there was evidence that the field might be worth as much as $3.639 billion. We point this out not to disturb the district court's finding, but to illustrate that potential tender offerors may value the Yates Field reserves at a higher figure than $2.8 billion, especially in today's world of ever-depleting oil supplies and the volatile, unpredictable nature of oil prices over the long term. Oil companies and other companies like USS seeking to invest in the oil industry may believe that long-term oil reserves, not cash or other assets, will best ensure long-term profits. As a result, we cannot say that Mobil and other potential bidders for control of Marathon would not be willing to make tender offers reflecting a Yates Field valuation far greater than $2.8 billion, were it not for the Yates Field option which USS possesses. Only the open market contemplated by the Act provides a means to measure its value.
 
 
 63
 The Yates Field option is exercisable if, and only if, control of Marathon is obtained by a third party. The only effect of this option can be to deter Mobil and any other potential tender offerors from competing with USS in an auction for control of Marathon. Others cannot compete on a par with USS; its bid of $125 per share thus amounts to an artificial ceiling on the value Marathon shareholders can receive for their shares. Therefore, there is a substantial likelihood that the option is manipulative under section 14(e) of the Williams Act.
 
 
 64
 The particular facts before us also indicate that the stock option that USS demanded and received in connection with its tender offer prevents all others from competing on a par with USS for control of Marathon. In our opinion, the stock option was large enough in this takeover contest to serve as an artificial and significant deterrent to competitive bidding for a controlling block of Marathon shares.
 
 
 65
 The stock option gave USS the right to purchase 10 million authorized but unissued shares of Marathon for $90 per share. USS could exercise its option at any time during the takeover contest and acquire 10 million newly issued shares; presently there are 58,685,906 Marathon common shares outstanding. The original Mobil tender offer was for 40 million shares at a price of $85 per share. The USS tender offer was for 30 million shares at $125 per share. An estimate prepared by the First Boston Corporation, Marathon's investment banker, calculated that because of the stock option, it would cost Mobil (or any other outside bidder seeking 40 million shares of Marathon) 1.1 to 1.2 billion additional dollars to match the USS tender offer. A chart contained in page six of the first Boston report discloses that every dollar raise in the bid by USS would cost USS $30 million, while each such dollar raise would cost Mobil $47 million. App. 718. Harold D. Hoopman, president and chief executive officer of Marathon, testified about the stock option and the First Boston chart, which the Marathon directors had before them when they decided to grant the stock option to USS on November 18, 1981, as follows:
 
 
 66
 Q. That would be 1.2 billion of additional cost to Mobil if they attempted to match US Steel, isn't that true?
 
 
 67
 A. That's true.
 
 
 68
 Q. Would you agree that the fact as it relates to Mobil, or a third party, of giving this option in terms of these costs would mean that any third party or Mobil would have to put up a very significant additional amount of money in order to make a tender offer?
 
 
 69
 A. That's correct.
 
 
 70
 Q. Was that discussed at the meeting?
 
 
 71
 A. Yes.
 
 
 72
 Q. It was discussed, I assume, on the basis that if we can make this fly, this is one way to make it much more expensive for Mobil to come to the same price; isn't that true?
 
 
 73
 A. That's true.
 
 
 74
 Q. Further, you discussed this would be a deterrent not only to Mobil, but to other third parties, wouldn't it?
 
 
 75
 A. That's right.
 
 
 76
 App. 201-202.
 
 
 77
 The size and price of the stock option, together with the fact that it was granted to USS, a tender offeror, prevented all others from competing on a par with USS for a controlling block of Marathon shares, and tipped the scales decidedly in favor of USS. In our opinion, the stock option artificially and significantly discouraged competitive bidding for the Marathon stock.
 
 
 78
 The Yates Field option and the stock option, both individually and in combination, have the effect of circumventing the natural forces of market demand in this tender offer contest. Were this contest a straight price-per-share auction, tender offers well in excess of the USS offer of $125 per share may have been forthcoming. Of course, Mobil itself has offered $126 per share, conditional on the judicial removal of the options. Our task under the Williams Act is not to speculate about what price the Marathon shareholders might have been offered if the natural market forces existed in this tender offer contest, but rather to enforce the mandate of section 14(e) against manipulation of the market. The purpose of the Williams Act, protection of the target shareholders, requires that Mobil and any other interested bidder be permitted an equal opportunity to compete in the marketplace and persuade the Marathon shareholders to sell their shares to them.
 
 
 79
 The defendants argue that section 14(e) requires full disclosure and nothing more. They point to the following language in the Supreme Court's opinion in Santa Fe, concerning section 10(b):
 
 
 80
 (T)he Court repeatedly has described the "fundamental purpose" of the (Securities Exchange) Act as implementing a "philosophy of full disclosure"; once full and fair disclosure has occurred, the fairness of the terms of the transaction is at most a tangential concern of the statute.
 
 
 81
 430 U.S. at 477-78, 97 S.Ct. at 1302-03. The defendants read too much into this language. Santa Fe held that mere allegations of unfairness and breach of fiduciary duty by majority shareholders to the minority did not violate section 10(b). It did not find that nondisclosure was the only ground upon which to base a 10(b) claim. Instead, the Court expressly made a factual determination that "the conduct ... alleged in the complaint was not 'manipulative' ..." 430 U.S. at 476, 97 S.Ct. at 1302. Santa Fe thus cannot be taken to mean that conduct that falls within the special meaning of the term "manipulation" is legal so long as it is fully disclosed. "(N)ondisclosure is usually essential to the success of a manipulative scheme," id. at 477, 97 S.Ct. at 1302, but this case illustrates that disclosure alone does not always mean that there is no manipulation. It may be that the Marathon shareholders in this case have now been fully informed that their management granted USS the Yates Field option and the stock option. They may now understand fully how these options deter any tender offers higher than $125 per share. Yet, they have had no real alternative to accepting the USS offer, because Mobil's offer of $126 is conditional upon the invalidity of the options, and there is and could be no other comparable tender offer as long as the "lock-up" options remain in effect. The artificial ceiling on the price of their shares at $125 is manipulation to which they must submit whether it is disclosed to them or not, since in not tendering their shares to USS they risk being relegated to the "back end" of USS's takeover proposal and receiving only $90 per share.
 
 
 82
 In short, to find compliance with section 14(e) solely by the full disclosure of a manipulative device as a fait accompli would be to read the "manipulative acts and practices" language completely out of the Williams Act.
 
 
 83
 The district court found that the Marathon directors' decision on November 18, 1981 to accept USS's proposed merger agreement, including the Yates Field and stock options, was not a breach of fiduciary duty. The district court's holding was based in part on its finding that the Marathon, directors were faced with a non-negotiable package proposal from USS which had to be accepted or rejected in less than a day, and which they accepted because they felt it was the only way they could get the USS $125 bid for their shareholders. (Mobil's bid at that time was $85.) In holding today that the option agreements were manipulative under section 14(e) of the Williams Act, we need not disturb the district court's finding of good faith and loyalty by the Marathon directors. Section 14(e) prohibits manipulation by "any person", and thereby covers the conduct of USS in demanding and obtaining the options, as well as any manipulative conduct by the Marathon directors. The Williams Act protects the target shareholders regardless of who did the manipulating.
 
 
 84
 In conclusion, it is apparent to us that the particular options granted to USS by Marathon under the circumstances of this tender offer contest constitute "manipulative acts" in connection with the tender offer, violative of section 14(e) of the Williams Act. In so ruling, we do not purport to define a rule of decision for all claims of manipulation under the Williams Act, or indeed for all forms of options which might be claimed to "lock up" takeover battles or otherwise discourage competing tender offers. We leave these issues to developing law in this new and difficult area of securities regulation.
 
 RELIEF
 
 85
 By the terms of its tender offer, USS gave Marathon shareholders a time in which to tender their shares and in turn promised that it would not withdraw its tender offer before that time. These dates have been extended. It is apparent from the record that a substantial majority of shareholders have agreed with the trial judge that the tender offer was reasonable and that they desired to accept it. It would be anomalous, indeed, if after our holding that USS had engaged in manipulative practices under § 14(e), it was by the very illegality of its conduct able to gain an unjustified benefit by the untimely withdrawal of the offer after its conduct may have dissuaded others from entering into the field as competing tender offerors. In this respect, the fashioning of appropriate equitable relief requires, and we so order, that the tender offer of USS of $125 per share be kept open for a reasonable time but free of the inhibiting and unlawful impact of the two options which it extracted from the Marathon board as a condition of its agreement.[6] Therefore, considerations of equity require that there be a time sufficient for adequate notice to Marathon shareholders under the Williams Act and to give shareholders an opportunity to withdraw their tenders of stock already made. The period of time likewise should be sufficient to permit the acceptance of any competing tender offers by Marathon from others who may now have an interest in bidding, uninhibited by the coercive impact of the two options which have been declared violative of § 14(e).
 
 
 86
 Reversed and remanded to the District Court for further proceedings consistent with this opinion. The mandate shall issue forthwith.
 
 
 87
 MERRITT, Circuit Judge, dissenting.
 
 
 88
 Although I do not disagree that some defensive moves by a tender offeror may be found to be manipulative acts under the Williams Act, my view is that Mobil's Williams Act case is moot in light of our disposition of the antitrust case. Mobil's ability to raise and maintain a Williams Act challenge to the option arrangement necessarily rests on the assumption that Mobil can, in fact, make a tender offer. Having by injunctive order decided that it is legally impossible for Mobil to make such an offer, Mobil's ability to raise the Williams Act claim has disappeared and the issues are moot in a lawsuit between Mobil and Marathon.
 
 
 89
 Mobil's Williams Act claims to market neutrality are moot because it can assert its claim only as a tender offeror. Although Mobil is also a shareholder of Marathon, Mobil cannot, consistently with the purposes of the Williams Act, sue in the posture of a target shareholder or as the representative of stockholders when its real interest is as a tender offeror. The Supreme Court in Piper v. Chris-Craft Industries, 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977), rejected the theory that an actively competing tender offeror may sue, qua shareholder, for violation of section 14(e). A rival tender offeror competing for target company stock cannot sue "in the posture of a target shareholder confronted with the decision of whether to tender or retain its stock." Piper, supra at 35, 97 S.Ct. at 946.
 
 
 90
 Because the § 14(e) issue is moot, we need not reach the issue left open in Piper, whether section 14(e) confers on rival tender offerors standing to seek injunctive relief. And we need not define the meaning of manipulation under the Williams Act.
 
 
 91
 This is not a case in which the Williams Act issue "evades review." The manipulation issues may be raised by a stockholder and perhaps by a competing tender offeror-although we need not decide this issue-who is not legally disabled from bidding. In this case, the interests of the stockholders are not represented, and I do not think we should decide the issue.
 
 
 92
 I would dismiss this appeal.
 
 
 
 [1]
 In a very belated amicus brief Local Unions of the United Steelworkers, et al., contend that U.S. Steel should be employing its assets and credit to modernize its steel plants rather than for purchasing an oil company. Whatever merit there may be to this contention, no party to this litigation presented this issue in the District Court. Even more important, to our knowledge, Congress has not adopted any statute which would authorize the federal courts to prohibit on this ground the acquisition contemplated by U.S. Steel
 
 
 [2]
 Ohio Rev. Code § 1701.76 provides in part:
 (A) A lease, sale, exchange, transfer, or other disposition of all or substantially all, the assets, with or without the good will, of a corporation, if not made in the usual and regular course of its business, may be made upon such terms and for such consideration, which may consist, in whole or in part of money or other property of any description, including shares or other securities or promissory obligations of any other corporation, domestic or foreign, as may be authorized: (1) by the directors, either before or after authorization by the shareholders as required in this section; and (2) at a meeting of the shareholders held for such purpose, by the affirmative vote of the holders of shares entitling them to exercise two-thirds of the voting power of the corporation on such proposal, or if the articles so provide or permit, by the affirmative vote of a greater or lesser proportion, but not less than a majority, of such voting power, and by such affirmative vote of the holders of shares of any particular class as is required by the articles. Notice of the meeting of the shareholders shall be given to all shareholders whether or not entitled to vote thereat. Such notice shall be accompanied by a copy or summary of the terms of such transaction.
 
 
 [3]
 Our holding makes unnecessary for purposes of this appeal any consideration of whether Marathon acted in violation of state law or violated disclosure requirements of section 14 of the Williams Act, 15 U.S.C. § 78n(e)
 
 
 [4]
 See Weeks Dredging & Contracting, Inc. v. American Dredging Co., 451 F.Supp. 468 (E.D.Pa.1978); Humana, Inc. v. American Medicorp, Inc., 445 F.Supp. 613 (S.D.N.Y.1977). Cf. Crane Co. v. Harsco Corp., 511 F.Supp. 294 (D.Del.1981) (a tender offeror has an implied cause of action for an injunction under section 14(e) of the Williams Act.)
 
 
 [5]
 In Touche Ross v. Redwine, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), it was held that there is no cause of action for damages in favor of the customers of a stock broker against an accounting firm which had submitted information required under section 17(a) of Securities Exchange Act of 1934, 15 U.S.C. § 78q(a) (1970 ed.), information claimed to be misleading. In denying relief, the Supreme Court found that the primary purpose of section 17(a) is not to benefit the customers of the stock brokers, but rather merely to provide the government with information. The Court further emphasized that section 17(a) does not proscribe conduct as illegal. The facts are, however, clearly inapposite. Unlike section 17(a), section 14(e) and the Williams Act generally are directly designed to protect shareholders as a class. Even more important, section 14(e) does proscribe conduct, conduct which is the subject of this litigation
 
 
 [6]
 By this order we do not deprive USS of any benefit of its proposed bargain, except the illegal option advantages. These, of course, do not diminish the value of Marathon to USS-if USS proves to be the successful bidder