Barbara SCHREIBER, Plaintiff,

v.

BURLINGTON NORTHERN, INC., R–H Holdings Corporation, the El Paso Company, Travis Hubert Petty, William V. Holik, Jr., M.R. Engler, Jr., W.G. Henderson, R.S. Morris, M.A. Ehrlich, A.M. Derrick, Richard L. McConn, D.J. Mac-Iver, Jr., and L.M. Varen Kamp, Defendants.

Civ. A. No. 83–13.

United States District Court, D. Delaware.

June 27, 1983.

Thomas D. Whittington, Jr., and Judith N. Renzulli of Wilson, Whittington & Aulgur, Wilmington, Del., Irving Bizar of Pincus Ohrenstein Bizar D'Alessandro & Solomon, New York City, of counsel, for plaintiff.

A. Gilchrist Sparks, III, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Marc P. Cherno and Stephen D. Alexander of Fried, Frank, Harris, Shriver & Jacobson, New York City, of counsel, for defendants Burlington Northern, Inc. and R–H Holdings Corp.

Robert K. Payson and James F. Burnett of Potter, Anderson & Corroon, Wilmington, Del., Mudge, Rose, Guthrie & Alexander, Wachtell, Lipton, Rosen & Katz, New York City, of counsel, for defendants The El Paso Co. and the El Paso Directors.

## OPINION

LATCHUM, Chief Judge.

The term "manipulation" as used in Section 14(e) of the Williams Act, 15 U.S.C. § 78n(e), has defied precise definition. The Act itself does not delineate its scope nor has the Securities and Exchange Commission ("SEC") prescribed its exact meaning in its rules and regulations. Thus, the federal courts have been left to give meaning

to the term on a case-by-case basis. A number of decisions, in an effort to explain its meaning within the context of the statute, have focused on the particular fact situations to which plaintiffs have sought to apply the Act. This Court must similarly approach the problem in the limited context of determining whether the alleged breach and withdrawal of a proposed tender offer constitutes a Section 14(e) manipulative violation.

Presently before the Court are defendants' motions to dismiss the amended complaint brought under Section 14(e) by the plaintiff, Barbara Schreiber, an El Paso Gas Company ("El Paso") stockholder. Plaintiff brings this action seeking damages on her own behalf and on behalf of all other El Paso shareholders similarly situated against El Paso, El Paso's directors, Burlington Northern, Inc. ("Burlington"), and R–H Holdings Corporation ("R–H"), a wholly owned Burlington subsidiary.

## FACTS

█ For the purposes of the present motions to dismiss, the Court must accept the allegations of the amended complaint as true. The allegations of the complaint may be summarized as follows: By December, 1982, R–H had acquired 537,800 of El Paso's shares in the open market. R–H then decided to make a tender offer for 25.1 million shares of El Paso, which constituted 51% of El Paso's common stock. On December 20, 1982, Burlington's chief executive officer informed El Paso's directors of its impending tender offer.

On December 21, 1982, R–H made its tender offer (the "December tender offer") for 25.1 million shares at $24 per share. The offer provided certain "outs" for R–H by which it could terminate the offer:

Notwithstanding any other provision of the Offer, the Purchaser shall not be required to accept for payment or pay for tendered Shares, or may terminate or amend the Offer ... if, at any time on or after December 17, 1982 and prior to the acceptance for payment of any such

Shares ..., any of the following shall occur: ... if, in the sole judgment of the Purchaser, in any such case, regardless of the circumstances (including any action or inaction by the Purchaser) giving rise to any such condition, such condition makes it inadvisable to proceed with the Offer and/or with such purchase or payment.

(Docket Item ["D.I."] 24, at 4–5.)

On December 29, 1982, the plaintiff tendered her El Paso shares in response to the December offer and later that tender offer was fully subscribed. At first, El Paso's management decided to resist the December tender offer and began a number of defensive moves: it sued Burlington in the Delaware Court of Chancery and in the U.S. District Court for the Northern District of Texas; it filed a Schedule 14D–9 with the SEC in which it threatened to dispose of its assets; it also announced the issuance of a new class of preferred stock [1] and amended its by-laws.

Thereafter, El Paso and Burlington entered into negotiations. As part of the negotiations, plaintiff alleges that the defendant directors of El Paso entered into special agreements with El Paso to provide them with "golden parachutes" in the form of extended employee benefits, allegedly worth millions of dollars, in the event El Paso should be taken over.

On January 10, 1983, the parties resolved this dispute and agreed to the following:

(a) Defendants Burlington and R–H would rescind and cancel the December offer and instead, would tender a new offer ("January offer") seeking to acquire only 21,000,000 shares of El Paso stock at $24 cash net per share and would purchase an additional 4,166,667 shares directly from El Paso also at $24 net per share. In addition, Burlington was granted an option to purchase an additional 1,950,000 common shares of El Paso at $24 per share.

(b) Burlington and R–H would recognize the "Golden Parachutes" of defend-

---

1. El Paso accomplished the issuance of a new class of preferred stock by "issuing a dividend upon its common stock, ... which had rights

designed to inhibit business combinations and to change existing voting rights of El Paso's common stockholders." (D.I. 27, at 4.)

ants Petty, Holik, Engler and Henderson and by their January offer enable the individual defendants to tender their El Paso shares to Burlington, which had not been tendered pursuant to the December offer.

(D.I. 5, at 7–8.) The following day R–H commenced its second or January tender offer which sought only 21 million shares at the same $24 per share price. On February 8, 1983, R–H accepted 21 million shares for payment after more than 40 million shares had been tendered.

Thereafter, the plaintiff commenced this action alleging that defendants' conduct violated Section 14(e) of the Williams Act in the following manner:

(a) The improper termination and withdrawal of the tender offer constituted a willful breach of the tender offer agreements entered into pursuant to the December offer between plaintiff and the other members of the class and defendants Burlington R–H and have caused loss and damage to the tendering plaintiff and class members in they they have been denied their contractual right to receive $24 per share net cash for each of their El Paso shares and said damage has occurred by reason of the conduct of defendants Burlington and R–H, as well as the wrongful interference by defendant El Paso and the individual defendants in said contractual arrangements.

(b) The January offer omits to inform the shareholders of El Paso of the Golden Parachutes granted by El Paso to defendants Petty, Holik, Engler and Henderson and that the individual defendant directors caused a cancellation of the prior tender offer to enable a tender of their own shares and was not for the benefit of the public shareholders of El Paso.

(D.I. 5, at 8–9.) [2]

Thus, plaintiff alleges that as a result of this activity she and the class members

were damaged because they were deprived of the December tender offer price of $24 per share. Moreover, plaintiff contends that since she and the class members are required to retender their shares along with all other El Paso shareholders in the January offer, their shares which had been fully tendered in the December offer are now subject to extensive proration. Plaintiff therefore seeks damages for the alleged Section 14(e) violations and has moved the Court to certify this litigation as a class action encompassing all El Paso shareholders who tendered their shares in response to the December offer.

As previously indicated, all of the defendants have moved to dismiss the amended complaint under Fed.R.Civ.P. 12(b)(6). Specifically, defendants contend that the amended complaint fails to state a claim upon which relief can be granted because the willful breach of a tender offer contract or a tortious interference with such a contract are not violations of Section 14(e). In addition, defendants argue that the failure to disclose that El Paso granted "golden parachutes" to its directors and that these directors breached their fiduciary duties by causing the termination of the December tender offer are also not Section 14(e) violations because the failure to disclose a breach of fiduciary duty in tender offer materials is not a Williams Act violation.

The plaintiff counters by arguing that defendants' activity in terminating the December tender offer and initiating the January tender offer constituted a manipulative practice in violation of Section 14(e) and relies upon the Sixth Circuit's recent decision in *Mobil Corp. v. Marathon Oil Co.*, 669 F.2d 366 (6th Cir.1981), in support of that argument. The nondisclosure claims, plaintiff contends, are sufficiently pled to withstand a dismissal motion.

---

**2.** There are also currently pending in the Delaware Court of Chancery three actions: *Breitman v. Burlington Northern, Inc.*, C.A. No. 7075 (filed Jan. 19, 1983); *Steiner v. Burlington Northern, Inc.*, C.A. No. 7079 (filed Jan. 19, 1983); and *Gilbert v. El Paso Company*, C.A. No. 7075 (filed Jan. 17, 1983). The *Gilbert* case has been certified to proceed as a class action. (D.I. 24A, Ex. D.) These cases raise the issues of breach of contract, breach of fiduciary duties, tortious interference with contract and conspiracy. (D.I. 24A, Ex. A–D.)

## DISCUSSION

### A. *Manipulation Claim*

The first question is whether the termination of the December tender offer and the initiation of the January tender offer amounted to manipulation within the meaning of that term in Section 14(e). We begin the analysis with the understanding that the basic purpose of the federal securities laws is to require "adequate disclosure." This concept had its origin in the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, which was passed in response to the abuses that led to the 1929 stock market crash. As envisaged by Congress, the purpose of the securities laws was to ensure that potential investors would have available to them sufficient information to enable them to make a reasoned decision as to whether or not to engage in a particular securities transaction. Indeed, President Roosevelt wrote Congress during consideration of the Securities Exchange Act of 1934:

> There remains the fact, however, that outside the field of legitimate investment, naked speculation has been made far too alluring and far too easy for those who could and for those who could not afford to gamble.

> Such speculation has run the scale from the individual who has risked his pay envelop or his meager savings on a margin transaction involving stocks with whose true value he was totally unfamiliar, to the pool of individuals or corporations with large resources, often not their own, which sought by manipulation to raise or depress market quotations far out of line with reason, all of this resulting in loss to the average investor, who is of necessity personally uninformed.

Letter of President Franklin D. Roosevelt, S.Rep. No. 792, 73d Cong., 2d Sess. 1–2 (1934).

Furthermore, encompassed with the concept of adequate disclosure was the belief that an investor should be protected from those who might deceive or manipulate; the fear being that clandestine activity would improperly influence the investor or the market in general. In this respect, the Fletcher Report of the Senate Banking and Currency Committee noted: "The true function of an exchange is to maintain an open market for securities, whose supply and demand may freely meet at prices uninfluenced by manipulation or control." Stock Exchange Practice, Report of Senate Banking and Currency Committee, S.Rep. No. 1455, 73d Cong., 2d Sess. 30 (1934). Thus, any manipulative activity that would interfere with the normal functioning of supply and demand would be prohibited by the Securities Exchange Act. Illustrative of manipulative activity at the time of the Act's passage was the use of pools, whereby a group would secretly agree to actively trade in a single security so as to raise its price and then the pool members would unload the securities at a profit to the unsuspecting public. The Fletcher Report pointed out that, "the activity fomented by a pool creates a *false and deceptive appearance of genuine demand* for the security on the part of the purchasing public and attracts persons relying upon this misleading appearance to make purchases." *Id.* at 32 (emphasis added).

The basic philosophy under the 1934 Act was carried forward in the enactment of the Williams Act. During consideration of this legislation, its sponsor, Senator Harrison Williams, stated that the Act "provides for full disclosure in cash tender offers," 113 Cong.Rec. 24664 (1967) (statement of Sen. Williams), and that "[t]hrough this legislation people will have more information, and will be able to intelligently decide whether to accept a tender offer and sell their shares to a group which may wish to obtain a controlling interest." *Id.* at 24665. In particular, Senator Williams stated:

> The essential problem in transfers of control resulting from cash tender offers or open market or privately negotiated purchases is that persons seeking control in these ways are able to operate in almost complete secrecy concerning their intentions, their commitments and even their identities. Since the competence and integrity of management and con-

trolling persons are of vital importance to stockholders, secrecy in this essential area is inconsistent with the disclosure pattern generally prevailing in the American securities markets.

*Id.* at 855.

Thus, the underlying purpose of the Williams Act is the adequate disclosure of information to the shareholder "so that they can make informed investment decisions on the basis of the same facts known by the person making the tender." *Id.*

Those cases that have examined the purpose of the Williams Act have reaffirmed consistently that it is principally a disclosure statute. *See Dan River, Inc. v. Icahn,* 701 F.2d 278 [current] Fed.Sec.L.Rep. (CCH) ¶ 99,043, at 94,961 (4th Cir.1983); *Panter v. Marshall Field & Co.,* 646 F.2d 271, 282–83 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); *Whittaker Corp. v. Edgar,* 535 F.Supp. 933, 947 (N.D.Ill.1982); *Martin Marietta Corp. v. Bendix Corp.,* 549 F.Supp. 623, 627–29 (D.Md.1982); *Oklahoma Publishing Co. v. Standard Metals Corp.,* 541 F.Supp. 1109, 1112–13 (W.D.Okl.1982); *Merritt v. Colonial Foods, Inc.,* 499 F.Supp. 910, 913–14 (D.Del. 1980); *Berman v. Gerber Products Co.,* 454 F.Supp. 1310, 1318 (W.D.Mich.1978); *In re Sunshine Mining Co. Securities Litigation,* 496 F.Supp. 9, 11 (S.D.N.Y.1979). In fact, the Supreme Court has stated that the Williams Act "was designed solely to get needed information to the investor . . . ." *Piper v. Chris-Craft Indus., Inc.,* 430 U.S. 1, 30–31, 97 S.Ct. 926, 943–944, 51 L.Ed.2d 124 (1977). *See Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975).

Now that this Court has determined that the Williams Act is essentially a disclosure statute, it becomes necessary to determine how the term "manipulation" fits within this context.

In *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court stated that manipulation is "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Id.* at 199, 96 S.Ct. at 1384. Similarly, in *Santa Fe Industries v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the Court ruled that manipulation is activities "that are intended to mislead investors by artificially affecting market activity." *Id.* at 476, 97 S.Ct. at 1302.

*Ernst & Ernst* and *Santa Fe* both require an element of deception in order to be a manipulative violation. *See* Prentice, *Target Board Abuse of Defensive Tactics: Can Federal Law Be Mobilized to Overcome the Business Judgment Rule?,* 8 J. of Corp. Law 337, 354 (1983). The unfairness of a securities transaction, absent deception, the *Santa Fe* Court emphasized, is not the primary concern of the federal securities laws; rather, this is a concern of state law. 430 U.S. at 478–80, 97 S.Ct. at 1303–1304.

Moreover, deception alone is not manipulation under Section 14(e). The manipulative activity must *artificially affect* the market price *and* do so in a misleading or deceptive manner. Manipulation essentially constitutes "artificial acts of stimulative trading designed to mislead investors into believing there was a heavy market demand for" the stock. *Hundahl v. United Benefit Life Ins. Co.,* 465 F.Supp. 1349, 1363 (N.D.Tex.1979).[3]

The fact, however, that a party's activity may affect market price cannot be the basis for a federal securities violation in the absence of deception. This was pointed

---

**3.** Plaintiff has attempted to distinguish some of these cases by arguing that they are inapplicable because they are based on Rule 10b–5 instead of Section 14(e). This is a highly technical distinction. Except for the "in connection" requirement of Rule 10b–5, the two provisions are substantially the same. *See, e.g., Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 605 (5th Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct.

134, 42 L.Ed.2d 113 (1974); *Bucher v. Shumway,* [1979–1980 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 97,142, at 96,299 (S.D.N.Y.1979), *aff'd,* 622 F.2d 572 (2d Cir.), *cert. denied,* 449 U.S. 841, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980). *In re Sunshine Mining Co. Securities Litig.,* [1979–1980 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,217, at 96,635–36 (S.D.N.Y.1979).

out by Congress at the time the Securities Exchange Act was adopted:

> Any extensive purchases or sales are bound to cause changes in the market price of the security, but mere knowledge on the part of the purchaser or seller that his transaction will have this effect is not sufficient to bring him within the scope of this provision. Thus, if a person is merely trying to acquire a large block of stock for investment, or desires to dispose of a big holding, his knowledge that in doing so he will affect the market price does not suffice to make his actions unlawful.

S.Rep. No. 792, 73d Cong., 2d Sess. 17 (1934).

█ Thus, if the ordinary investor is able to reasonably point to a disclosed basis for the price change of a particular stock, there has not been manipulation under the Williams Act. It is when the activity in question is done in such a manner that the reason for the artificial change in price is undetectable by the ordinary investor that there is manipulation.

█ Applying the above analysis to the instant case, the Court finds that the amended complaint fails to state a claim for manipulation under Section 14(e) of the Williams Act. While it is true that the defendants' activities with respect to the tender offer did influence the price of the stock, the amended complaint fails to allege any deception by the defendants. All activity of the defendants that could have conceivably affected the price of the El Paso shares was done openly. If the Court were to hold that defendants' actions in terminating the December tender offer and initiating the January tender offer constituted manipulation under Section 14(e), then potential offerors and management of target companies would be subject to liability every time a tender offer is revised or negotiated. Some latitude must be given in the

application of the Williams Act for it was designed to enhance market activity through open supply and demand, not artificially restrain it.

As noted at the outset, plaintiff relies upon *Mobil Corp. v. Marathon Oil Co.,* 669 F.2d 366 (6th Cir.1981), to support its contention that the activities complained of here amounted to manipulation. In that case, Marathon was the target of Mobil's unfriendly tender offer. In resisting the tender offer, Marathon entered into an agreement with U.S. Steel which granted the latter an option to purchase one of Marathon's most valuable assets in the event U.S. Steel was unable to effectuate a successful tender of its own for Marathon. *Id.* at 367–68. The Court of Appeals for the Sixth Circuit held that the "lock-up" option given to U.S. Steel constituted a manipulative practice because it foreclosed bidding for the acquisition of Marathon.

The plaintiff argues that the activities complained of here are of a similar nature and the reasoning of *Mobil* should be followed. This Court disagrees. The *Mobil* decision is not the law of this Circuit, and it also appears to be an aberration in this field of the law.[4] As the commentators contend, and this Court agrees, the *Mobil* decision is inconsistent with the rationale of the *Santa Fe* case. An analysis of the Williams Act shows that a key ingredient of a manipulative practice is deception, the direct opposite of disclosure, which the *Santa Fe* Court clearly pointed out. As that Court stated, "it repeatedly ... has described the 'fundamental purpose' of the Act as implementing a 'philosophy of full disclosure'; once full and fair disclosure has occurred, the fairness of the transaction is at most a tangential concern of the statute." 430 U.S. at 477–78, 97 S.Ct. at 1302–1303.

█ The allegedly manipulative activity of withdrawing the December tender offer

4. Legal commentators have soundly criticized *Mobil. See, e.g.,* Prentice, *Target Board Abuse of Defensive Tactics: Can Federal Law Be Mobilized to Overcome the Business Judgment Rule?* 8 J. of Corp. Law 337, 353–58; Profusek, *Tender Offer Manipulation: Tactics and Strate-*

*gies After Marathon,* 36 Sw.L.J. 975, 991–95 (1982); Note, *The Future of Lock-Ups After Mobil Corp. v. Marathon Oil,* 27 St. Louis U.L.J. 261, 281–82 (1983); Note, *"Lock-Up" Enjoined Under Section 14(e) of Securities Exchange Act,* 12 Seton Hall L.Rev. 881, 891–95 (1982).

in violation of alleged contractual arrangements was disclosed to the shareholders and the general public. Because there was no deception practiced upon the shareholders in terminating their alleged contractual rights, there was no manipulative violation within the meaning of Section 14(e) and defendants' motion to dismiss the manipulative claim will be granted.

### B. *Nondisclosure Claim*

Plaintiff's second claim is that the nondisclosure of El Paso's grant of "golden parachutes" to its directors and the fact that these directors caused the withdrawal of the December tender offer and the initiation of the January offer for their personal gain constituted a Section 14(e) violation. Defendants contend that this so-called nondisclosure claim should likewise be dismissed.

██ Generally, the Williams Act requires the tender offeror to disclose material information to the shareholders of the target company. This Court, however, need not decide whether the alleged omissions are material, but even if they are, they are completely unrelated to the damages alleged. Plaintiff avers that her damage was a result of the withdrawal of the December tender offer. But even if the alleged undisclosed facts had been transmitted to the El Paso shareholders, it would have had no effect whatsoever upon the withdrawal of the December offer, because it was R–H's management and not El Paso's shareholders who withdrew the December offer.[5]

This action is analogous to two cases where plaintiffs alleged injury due to withdrawal of tender offers for their stock, *Panter v. Marshall Field & Co.,* 646 F.2d 271 (7th Cir.1981), and *Lewis v. McGraw,* 619 F.2d 192 (2d Cir.) (per curiam), *cert. denied,* 449 U.S. 951, 101 S.Ct. 354, 66 L.Ed.2d 214 (1980). In both cases, the plaintiffs sued under Section 14(e), contending that the tender offer materials contained misrepresentations. Both the Second and Seventh Circuits found in their respective cases that there was no Section 14(e) violation because the tender offers were withdrawn before the shareholders could rely upon them. *Panter v. Marshall Field & Co., supra,* 646 F.2d at 283–84; *Lewis v. McGraw, supra,* 619 F.2d at 195.

██ Here the amended complaint fails to allege any causal nexus between the damage alleged by plaintiff—that shareholders who tendered to the December offer could not fully participate in the January offer because of proration and were hence "deprived of the benefit of the $24 per share acquisition price originally proposed by defendants (D.I. 5, at 10)—and the supposed omission of information in the January offer. Any failure to disclose the alleged breach of fiduciary duties by El Paso directors had absolutely no relevance to plaintiff's alleged damages. Consequently, the Court will dismiss plaintiff's so-called nondisclosure claim.

### C. *Pendent State Claims*

██ Plaintiff's amended complaint vaguely asserts that defendants' conduct in addition to violating Section 14(e) also violated "the principles of common law." Because this Court has dismissed the Williams Act claims, the only ones conferring subject matter jurisdiction upon the Court, the pendent state claims for breach of contract and breach of fiduciary duty will also be dismissed. The Supreme Court in *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), instructed: "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." To the same effect are: *Walck v. American Stock Exchange, Inc.,* 687 F.2d 778, 792 (3d Cir. 1982); *Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187, 195–96 (3d Cir.1976).[6]

---

**5.** The defendants also argue that they properly disclosed this information and in any event they were under no obligation to do so. Because this Court has found sufficient grounds for dismissing this claim, it need not consider these arguments.

**6.** Because the Court has dismissed all the claims in the amended complaint, there is no

## CONCLUSION

This case is the perfect example of a plaintiff, who may have nonfrivolous claims based on state law for breach of contract, tortious interference with contract, breach of fiduciary duties and perhaps even conspiracy, attempting to characterize those state law claims as violations of the federal securities laws. This ploy, however, has been foreclosed since *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). In that case, the Supreme Court held that courts should be reluctant to federalize a substantial portion of corporate law traditionally left to state regulations. Accordingly, it will be the Delaware Chancery Court, in its pending action, which will appropriately decide those corporate law issues.

An order will be entered in accordance with this opinion.

need to rule on plaintiff's motion for class certi-  fication.