Muriel BRILL, Plaintiff,

v.

BURLINGTON NORTHERN, INC., R–H Holdings Corporation, the El Paso Company, Travis Herbert Petty, William V. Holik, Jr., R.S. Morris, Howard Boyd, Willard F. Rockwell, Jr., W.D. Noel, L. Emory Katzenbach, Ben F. Love, Kenneth Rush, J.R. Hubbard and Shearson/American Express Inc., Defendants.

Civ. A. No. 83–345–JLL.

United States District Court, D. Delaware.

July 13, 1984.

Thomas D. Whittington, Jr. of Whittington & Aulgur, Wilmington, Del., and Mark I. Fishman, New York City, of counsel, for plaintiff.

A. Gilchrist Sparks, III and Lawrence A. Hamermesh of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Marc P. Cherno of Fried, Frank, Harris, Shriver & Jacobson, New York City, of counsel, for defendants Burlington Northern, Inc. and R–H Holdings Corp.

Robert K. Payson of Potter, Anderson & Corroon, Wilmington, Del., Mudge, Rose, Guthrie & Alexander, New York City, Wachtell, Lipton, Rosen & Katz, New York City, of counsel, for defendants The El Paso Co. and the El Paso Directors.

R. Franklin Balotti and Donald A. Bussard of Richards, Layton & Finger, Wilmington, Del., Wilkie, Farr & Gallagher, New York City, of counsel, for defendants Shearson/American Exp., Inc.

## OPINION

LATCHUM, Senior District Judge.

On June 27, 1983, this Court, in an action arising out of the same facts as this case, and brought on behalf of the same class of shareholders which this plaintiff purports to represent, dismissed the complaint which alleged violations under section 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(e) (1976). *Schreiber v. Burlington Northern, Inc.*, 568 F.Supp. 197 (D.Del. 1983), *aff'd*, 731 F.2d 163 (3d Cir.1984). In *Schreiber* this Court held that the plaintiff had failed to state a valid claim of the violation of section 14(e) because she alleged no injury from deception. On April 1, 1983, three months after the complaint was filed in the *Schreiber* case, Muriel Brill as plaintiff commenced this action in the United States District Court for the Southern District of New York ("the New York Court"). Brill's original complaint was practically a word-for-word copy of the complaint which had previously been filed in the *Schreiber* case. Defendants, Burlington Northern ("Burlington") and R–H Holdings Corporation ("R–H"), then filed a motion to dismiss or alternatively to stay the New York action or to transfer it to this District. (Docket Item ["D.I."] 3.) Brill consented to a transfer and on June 9, 1983, plaintiff filed an amended complaint alleging *inter alia* that: (1) the defendants

Burlington and R–H committed acts which were in violation of sections 14(d)(6), 14(d)(7), 14(e) and 20 of the Williams Act ("Act"). (D.I. 7.) On July 27, 1983, defendants Burlington, R–H, El Paso and Shearson/American Express ("Shearson") filed motions to dismiss Brill's amended complaint. (D.I. 14, 16.) Those motions are presently before this Court.[1]

## I. FACTS

The task of a federal court is necessarily limited when it reviews the sufficiency of a complaint before the reception of any evidence.[2] It is well established that, in ruling upon a motion to dismiss, the Court must accept the allegations of the amended complaint as true. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The amended complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The allegations of the amended complaint may be briefly summarized as follows:

By December 1982, R–H, a wholly-owned subsidiary of Burlington (D.I. 7 at ¶ 21), had acquired 537,800 shares of El Paso's stock in the open market. R–H then decided to make a tender offer for 25.1 million shares of El Paso stock. On December 21, 1982, R–H made its tender offer (the "December offer") for 25.1 million shares of El Paso stock at $24 per share. (*Id.* at ¶ 20.) Under the terms of the December offer, if certain conditions occurred, R–H could terminate the offer.[3]

---

1. On November 7, 1983, the parties entered into a stipulation that oral argument on defendants' motions to dismiss the complaint, which was originally scheduled for November 7, 1983, be postponed pending the decision of the Court of Appeals for the Third Circuit in *Schreiber v. Burlington Northern*. (D.I. 23.) *Schreiber* was affirmed by the Third Circuit on April 2, 1984. (*See* 731 F.2d 163 (3d Cir.1984).) Thereafter this Court rescheduled oral argument for defendants' motions to dismiss on May 23, 1984. (D.I. 24.)

2. In a Rule 12(b)(6) motion to dismiss, the court must not consider any "matters outside the

pleadings." In this case, the Court did consider matters presented in the "Appendix to Defendants Opening Brief," however, only those documents which were referred to in the plaintiff's amended complaint were reviewed by the Court. Therefore, the Court will still consider the motions as ones to dismiss.

3. Section 15 of the December Offer To Purchase stated *in pertinent part*:

    15. *Certain Conditions of the Offer.* Notwithstanding any other provision of the Offer, the Purchaser shall not be required to accept for payment or pay for tendered Shares, or

In accordance with the terms of the December offer, Brill tendered her shares. (*Id.* at ¶ 23.) Burlington and R–H received tender offers for 25.1 million or more shares. (*Id.*) Originally, the El Paso management decided to resist the December offer and began a number of defensive maneuvers including: (1) a suit filed by El Paso in the Delaware Chancery Court, and (2) the issuance of a new class of convertible preferred stock. (*Id.* at ¶ 25.)

Thereafter, El Paso entered into negotiations with Burlington and R–H. (*Id.* at ¶ 25.) On January 10, 1983, the defendants resolved their dispute and agreed to the following:

(a) Defendants Burlington and R–H would rescind and cancel the December offer and instead would make a new tender offer (the "January offer") to acquire 21 million shares of El Paso stock at $24 per share.

(b) Burlington and R–H would purchase an additional 4,166,667 shares directly from El Paso at $24 a share. (*Id.* at ¶ 28(b); D.I. 15A, Ex. C.)

(c) El Paso would grant Burlington an option to purchase an additional 4,950,-000 shares of El Paso stock at $24 per share. (D.I. 15A, Ex. D.)

(d) Burlington and R–H would recognize the contractual severance agreements ("Golden Parachutes") of defendants Petty, Holik and Morris and as part of the negotiations, these individual defendants, who had not tendered their own El Paso stock in accordance with the December offer, obtained the right to tender their El Paso stock to Burlington and R–H. (D.I. 7 at ¶¶ 26–27.)

Accordingly, on January 10, 1983, Burlington and R–H terminated the December offer and of the 25,433,166 shares of El Paso stock which were tendered, Burlington and R–H either physically returned the shares or cancelled the notices of guarantee that had been delivered. (D.I. 15A, Ex. D at 11.)

On January 11, 1983, Burlington and R–H commenced a second tender offer (the "January offer"). The January offer ended on February 7, 1983 and on February 8, 1983, Burlington and R–H accepted 21 million shares for payment after more than 40 million shares had been tendered.

In the amended complaint, plaintiff alleged that the defendants' conduct violated sections 14(d)(6), 14(d)(7), 14(e) and 20 of the Securities Exchange Act of 1934 in the following manner: [4]

. . . .

(h) Burlington and El Paso enter into an agreement for a merger or other business combination of the two companies.
(D.I. 15A, Exhibit ["Ex."] A at 18–19.)

may terminate or amend the Offer, or postpone the acceptance for payment or payment for Shares tendered, if, at any time on or after December 17, 1982 and prior to the acceptance for payment of any such Shares (whether or not any other Shares have theretofore been accepted for payment or paid for pursuant to the Offer), any of the following shall occur: (Briefly summarized)

(a) litigation instituted, threatened or pending challenging the December Offer or acquisition by Burlington of shares of El Paso;

(b) a governmental agency commences litigation against the Offeror to prevent the Tender Offer;

(c) there were any change or threatened change in the business, properties or assets of El Paso;

. . . .

(e) El Paso (i) issues, authorizes or proposes the issuance of capital stock of any class, (ii) El Paso authorizes, recommends, or proposes any disposition of assets not in the ordinary course of business;

(f) El Paso amends its Certificate of Incorporation or By-Laws; or

**4.** At oral argument on the defendants' motions to dismiss (D.I. 14), the plaintiff informed this Court that only six out of the original twelve causes of action (numbers 2, 3, 4, 6, 7 & 9) set forth in the amended complaint (D.I. 7) are before the Court for decision. In light of the decision in the *Schreiber* case, plaintiff conceded that she is not pursuing causes of action 1, 5 and 10. Additionally, causes of action 11 and 12 are common law contract and tort claims which are before this Court based upon the doctrine of pendent jurisdiction. (D.I. 24 at 14.) Similarly, the plaintiff concedes that cause of action 8, which alleges liability on a "controlling person" theory under section 20 of the 1934 Act, depends upon the Court's decision with respect to the remaining six causes of action (numbers 2, 3, 4, 6, 7, and 9). (*Id.*)

(a) Burlington and R–H violated section 14(d)(6) of the Act by reopening the proration pool under the guise of commencing a new tender offer in January.

(b) The addition of the 4,166,667 shares directly from El Paso, altered the proration pool.

(c) The taking up by Burlington and R–H of all the shares tendered by El Paso in the January offer while prorating the shares tendered by other persons.

(d) Burlington and R–H violated section 14(d)(6) of the Act by providing to the individual defendants in the January offer $24 per share plus the value of the Golden Parachutes which provided to the plaintiff and the other class members only $24 per share for these shares actually taken up.

(e) Burlington and R–H, aided and abetted by Shearson American Express, and El Paso omitted to disclose material facts in connection with the December offer and . . . .

Thus, plaintiff alleges that as a result of this activity, she and the other class members were damaged because they received less money than they otherwise would have received. First, the defendants argue that there was no "alteration" of the proration pool in violation of section 14(d)(6)[5] because the December and January tender offers constituted two separate tender offers and consequently there were two separate and independent proration pools. The defendants conclude that for the same reasons, the plaintiff's claim under section

14(d)(7)[6] for "unequal treatment" of tenderors during different stages of the supposed *same* tender offer must also be dismissed because there were, in fact, two separate and distinct tender offers made.

Second, the defendants argue that neither the severance contracts ("Golden Parachutes") nor the amount paid by Burlington to El Paso for the purchase of the 4,166,667 shares of unissued stock of El Paso constituted "consideration" for "tendered shares." Finally, defendants argue that plaintiff's disclosure claim that defendants failed to disclose to the El Paso shareholders that the December tender offer was a sham which no one intended to complete is without factual support.

## II. DISCUSSION

### A. *Alteration of Proration Pool—Section 14(d)(6)*

In 1934, the Exchange Act was designed to ensure that potential investors have sufficient information disclosed to them in order to permit them to make a reasoned decision as to whether or not to engage in a particular securities transaction. The primary purpose of the Williams Act is the protection of the shareholder of a target corporation who is presented with a tender offer so that the shareholder has the information necessary to make an *informed unpressured* investment decision. *See Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). To that end, Congress recognized the need for certain time and proration requirements

---

**5.** Section 14(d)(6) states:

(6) Where any person makes a tender offer, or request or invitation for tenders, for less than all the outstanding equity securities of a class, and where a greater number of securities is deposited pursuant thereto within ten days after copies of the offer or request or invitation are first published or sent or given to security holders than such person is bound or willing to take up and pay for, the securities taken up shall be taken up as nearly as may be pro rata, disregarding fractions, according to the number of securities deposited by each depositor. The provisions of this subsection shall also apply to securities deposited within ten days after notice of an increase in the consideration offered to security

holders, as described in paragraph (7), is first published or sent or given to security holders. 15 U.S.C. § 78n(d)(6).

**6.** Section 14(d)(7) states:

(7) Where any person varies the terms of a tender offer or request or invitation for tenders before the expiration thereof by increasing the consideration offered to holders of such securities, such person shall pay the increased consideration to each security holder whose securities are taken up and paid for pursuant to the tender offer or request or invitation for tenders whether or not such securities have been taken up by such person before the variation of the tender offer or request or invitation. 15 U.S.C. § 78n(d)(7).

in the Williams Act. In the present case, it is therefore the responsibility of this Court to determine whether those safeguards existed when Burlington and R–H proposed its December and January tender offers.

The first issues to be decided are: (1) whether or not there were two separate and distinct tender offers by Burlington and R–H, and (2) whether or not there was any violation of the proration rules of section 14(d)(6). The plaintiff contends that the January offer was, in actuality, a continuation of the December offer and therefore Burlington and R–H violated the proration rules of section 14(d)(6) by reopening the December proration pool in January to allow El Paso's officers and directors to tender their shares. (D.I. 7 at ¶¶ 36, 39.)

The defendants, on the other hand, argue that any tendering of the shares into the January offer did not effect an "alteration" of the December proration pool because the December offer was terminated and withdrawn on January 10, 1983, and all of the tendered shares were returned to the shareholders. (D.I. 15 at 12.)

In accepting the allegations of the amended complaint as true, this Court finds that there were two separate tender offers with two separate proration pools and no alterations in violation of section 14(d)(6).

■ The offeror, as the master of his offer, has wide latitude over terms of the offer. *Indiana National Bank v. Mobil Oil Corp.*, 578 F.2d 180 (7th Cir.1978). The offeror may impose as many conditions or terms as he may choose, including but not limited to conditions concerning time, place and method of acceptance. *Kroeze v. Chloride Group Ltd.*, 572 F.2d 1099 (5th Cir.1978). Thus, Burlington and R–H, as

the masters of the offer, had the right to terminate and withdraw the December offer as long as the offer did not specifically prohibit that action. Because the December offer contained a number of conditions, some of which occurred,[7] the December offer could have been terminated and withdrawn any time after December 17, 1982, and prior to acceptance by Burlington and R–H for payment.

The December offer began on December 21, 1982. The date of expiration was listed as January 19, 1983. On January 10, 1983, Burlington and R–H terminated and withdrew the December offer. (D.I. 15A, Ex. D at 11.) On January 11, 1983, Burlington and R–H commenced the January offer.[8] (*Id.*) On the face of the January 11th Offer to Purchase it stated and clearly disclosed that the December offer was terminated. It also disclosed that:

ALL CERTIFICATES FOR SHARES TENDERED INTO THE DECEMBER 21, 1982 OFFER WILL BE RETURNED TO THE TENDERING STOCKHOLDERS AS SOON AS POSSIBLE. ACCORDINGLY, TO VALIDLY TENDER SHARES INTO THIS OFFER, STOCKHOLDERS WHO TENDERED SHARES INTO THE DECEMBER 21, 1982 OFFER (BY PHYSICAL DELIVERY OF SHARES OR NOTICE OF GUARANTEED DELIVERY) MUST RE-SUBMIT THEIR SHARE CERTIFICATES (ACCOMPANIED BY THE YELLOW LETTER OF TRANSMITTAL, DATED JANUARY 11, 1983) OR COMPLY WITH THE GUARANTEED DELIVERY PROCEDURES.

(*Id.*) Plaintiff argues that in order for this Court to ascertain whether or not the December offer and the January offer constitute one or two tender offers, "the Court

---

7. For example, El Paso attempted to counter the tender offer by issuing shares of convertible preferred stock which was a violation of condition (e) in section 15 of the December Offer to Purchase. This attempted issuance by El Paso eventually became the subject of litigation between Burlington and El Paso. (D.I. 7 at ¶ 25.)

8. In the January offer, section 10 (Background of the Offer), it states:

On January 10, 1983, the Purchaser terminated the First Offer. At the time of the termination of the First Offer, the Depositary advised the Purchaser that 25,433,166 shares had been validly tendered. All of these Shares which were physically tendered are being returned to the tendering stockholders and all notices of guaranteed delivery have been cancelled.

must consider the objective realities and do so in light of such interpretive case law [9] as exists." (D.I. 18 at 11.) Plaintiff continues her argument by stating that the objective realities which the Court must consider are: (1) the December and January offers were addressed to the same group of persons for the same class of stock; (2) the price of the offer remained the same; (3) there was no intervening tender offer by another person; (4) the new offer was made before the tendering shareholders had gotten back their tendered shares; and (5) only one Hart-Scott-Rodino pre-merger notification form was required. (*Id.* at 12.)

In *Metro-Goldwyn-Mayer, Inc. v. Transamerica Corp.*, 303 F.Supp. 1354 (S.D.N.Y. 1969), an offeror *amended* an existing tender offer so as to increase the number of shares sought. The plaintiff argued that the amendment should have been considered a new offer requiring new Williams Act time periods. The court, however, rejected that argument and upheld the offeror's structuring of its offer and amendment with less protection to the shareholders than they would have received if a new offer had been made.

Similarly, in *McDermott Inc. v. Wheelabrator-Frye, Inc.*, 649 F.2d 489 (7th Cir. 1980), an offeror announced an *increase* in the number of shares which it was seeking in its tender offer without making a new offer. Plaintiff contended that this put too much time pressure on the shareholders, and that the amendment "created a new tender offer, thereby triggering the time requirements of the statute and regulations attendant upon the commencement of a tender offer." *Id.* at 492. The court,

nevertheless, held that there was no new offer, and that new Williams Act time periods were not required.

As a result of a review of the existing case law upon which plaintiff relies, this Court finds no authority to support plaintiff's position that the December and January tender offers must, as a matter of law, be considered one tender offer with proration pool. Instead, this Court finds that the December and January tender offers were structured in such a way that each would be separate and independent of the other. Additionally, each tender offer provided the shareholders of El Paso with the full panoply of Williams Act protections, including additional time and proration pools.

### B. *Burlington's and R–H's Purchase of El Paso Shares*

■ Plaintiff, in her third and fourth causes of action, alleges that she and members of the class were damaged by Burlington's arranging to purchase 4,166,667 shares directly from El Paso while reducing the number of shares to be acquired by the tender offer by 4,100,000 shares. Plaintiff contends that as a result of this reduction, she and the members of the class received almost $100 million less from Burlington than they otherwise would have received. Therefore, plaintiff says that Burlington's agreement to purchase the shares directly from El Paso (D.I. 15A, Ex. C) violated section 14(d)(6) of the Act by treating El Paso differently from its tendering shareholders.[10] This Court disagrees.

---

**9.** Plaintiff here principally relies on *Metro-Goldwyn-Mayer, Inc. v. Transamerica Corporation,* 303 F.Supp. 1354 (S.D.N.Y.1969); *McDermott Incorporated v. Wheelabrator-Frye, Inc.,* 649 F.2d 489 (7th Cir.1980); and *San Francisco Real Estate Investors v. Real Estate Investment Trust of America,* 692 F.2d 814 (1st Cir.1982), for the proposition that when the Court looks at the essence of the transaction and the objective realities of the "December and January" tender offer, it will find only one tender offer with one proration pool established by the December offer. (D.I. 18.)

**10.** Plaintiff also alleges in her answering brief (D.I. 18 at 16) that Burlington's agreement to purchase shares directly from El Paso violates Rule 10b–13, 17 C.F.R. § 240.10b–13. This is the first time plaintiff's Rule 10b–13 claim was ever advanced. There is no mention of any such claim in either of the plaintiff's complaints.

Although pleadings in Federal Court need not be specific or particularized, they nevertheless must notice or inform defendants of what the plaintiff's claim is and the grounds upon which they rest. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Tremps v. Ascot Oils,*

Plaintiff's allegations fail to state a cause of action under section 14(d)(6) of the Act for two reasons. First, section 14(d)(6) applies to "a tender offer, or request or invitation for tenders, for less than all the outstanding equity securities of a class, and where a greater number of securities is deposited *pursuant thereto* ...." In the present case, the stock that El Paso sold to Burlington and R–H was sold in accordance with the El Paso and Burlington/R–H "Stock Purchase Agreement" dated January 10, 1983, and not pursuant to any tender offer. (*See* D.I. 15A, Ex. C.)

Second, section 14(d)(6) only applies to "outstanding equity securities." The stock which El Paso sold to Burlington and R–H, in accordance with the January 10th agreement, was *authorized* but *unissued*[11] shares of El Paso. Shares which are authorized but unissued are not "outstanding equity securities" within the meaning of section 14(d)(6) because they have no existence until such shares are actually subscribed for or issued. *See* 11 Fletchers § 5082, 5088 (1971).

Because the January 10th Stock Purchase Agreement[12] between El Paso and Burlington did not result in El Paso depositing any "outstanding equity securities" pursuant to either the December or January tender offer, the plaintiff has failed to sufficiently allege facts in her third and fourth causes of action which would result in a violation of section 14(d)(6) of the Act.

### C. *Golden Parachutes*

■ In her sixth cause of action, plaintiff alleges that section 14(d)(6), which provides, *inter alia*, for the equality of treatment of persons who tender shares pursuant to a tender offer, was violated by Burlington's and R–H's providing to the individual defendants in the January offer $24 a share plus the value of the contractual severance agreements while providing to plaintiff and other class members only $24 a share for those shares which were accepted in the tender offer. This argument is also without merit.

The contractual severance agreements ("Golden Parachutes"), like the Stock Purchase Agreement, are collateral agreements to the tender offer and as such, the provisions of the Williams Act do not apply. *See* Section 14(d)(1), 15 U.S.C. § 78n(d)(1). The Golden Parachutes were agreements between the individual directors and El Paso, not with Burlington or R–H. Furthermore, they were entered into prior to the termination and withdrawal of the December offer. (D.I. 15A, Ex. D at 11.) As a result of the *tender offer*, Burlington's and R–H's offer only provided that the $24 a share would be paid to those shareholders whose shares were taken up. Thus, plaintiff's "unequal consideration" claim fails to state a cause of action under section 14(d)(6) of the Act.

### D. *Nondisclosure Claim*

■ In her ninth cause of action plaintiff claims that El Paso omitted to disclose material facts in connection with the *December* tender offer. (D.I. 7 at ¶ 63.) These alleged omissions by El Paso included:

(a) that the individual defendants were acting out of self-interest and were not

---

*Inc.*, 561 F.2d 41 (7th Cir.1977); *Ross v. Deposit Guaranty*, 400 F.Supp. 45 (S.D.Miss.1974). Therefore, this Court need not decide plaintiff's Rule 10b–13 claim because it was not properly pleaded in the complaints.

**11.** In the situation where there is authorized but *unissued* stock, the shareholders have granted the Board of Directors authority to issue such shares from capital stock as long as all of the shares of capital stock which the corporation is authorized to issue have not been issued, subscribed for or otherwise committed to be issued. *See* 8 *Del.C.* § 161.

**12.** Courts have also rejected the notion that pre-tender offer purchases should be "integrated" with purchases made pursuant to the offer. *See, e.g., Gulf & Western Indus., Inc. v. Great A & P Tea Co., Inc.*, 356 F.Supp. 1066, 1074 (S.D.N.Y.), *aff'd*, 476 F.2d 687 (2d Cir.1973); and *A.S.G. Industries, Inc. v. MLZ, Inc.*, 4 Del.J.Corp.L. 282, 287 (Del.Ch.1978), Exhibit G (pre-tender offer acquisition of an option to purchase shares not part of the tender offer).

seeking to obtain a higher price for El Paso shareholders;

(b) that the issuance of the convertible preferred stock and the adoptions of new by-laws were illegal;

(c) that El Paso negotiated a deal whereby Burlington and R–H would purchase, for the same price as was contained in the December offer, approximately the same number of shares but these shares would be purchased, in part, from the individual defendants and El Paso; and

(d) that El Paso made an untrue statement of material fact concerning the adequacy of the $24 per share tender offer price and that the plaintiff and other class members relied on El Paso's statements.

With respect to the issue of nondisclosure in the December tender offer, this Court need not decide whether or not El Paso omitted to disclose material facts because, even if there were any material omissions in the December tender offer, they are unrelated to the damages alleged. Plaintiff claims that she and each other class member, as a result of these Williams Act violations, received less money than he or she otherwise would have received. However, the December tender offer was withdrawn and terminated before the plaintiff or any other El Paso shareholder could rely on it. Therefore plaintiff's allegations that El Paso failed to disclose material facts in connection with the *December* offer, fails to allege any causal nexus between the damages alleged to plaintiff and the supposed omissions in the December offer. Therefore, this Court will dismiss plaintiff's ninth cause of action.

### E. *Shearson—Aiding and Abetting Claim*

In her seventh cause of action plaintiff avers that Shearson was Burlington's and R–H's financial adviser and dealer-manager for the *December* tender offer and as such it "aided and abetted" Burlington and R–H. (D.I. 7 at ¶¶ 8, 54.) Additionally, plaintiff claims Shearson aided and abetted Burlington and R–H in omitting to disclose materi-

al facts in connection with the December offer. The Court finds that this cause of action also fails to state a violation under the Act.

■ Liability for aiding and abetting a securities law violation requires pleading of three elements:

(1) that an independent wrong exist;

(2) that the aider or abettor knew of the wrong's existence; and

(3) that substantial assistance be given in effecting that wrong.

*See Walck v. American Stock Exchange, Inc.*, 687 F.2d 778, 790–91 (3d Cir.1982), and *Landy v. Federal Deposit Insurance Corp.*, 486 F.2d 139, 162–63 (3d Cir.1973), *cert. denied*, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974).

■ With respect to the first element of aiding and abetting liability, the existence of a securities violation by a primary defendant, the Court has concluded above that the amended complaint fails to state a claim upon which relief can be granted against Burlington and R–H. *See IIT, an International Investment Trust v. Cornfeld*, 619 F.2d 909, 922 (2d Cir.1980). Inasmuch as Shearson's purported liability is entirely derivative of Burlington's and R–H's liability for the alleged violations of section 14(e), dismissal of the amended complaint as against them requires its dismissal as against Shearson.

### F. *Pendent State Claims*

■ In her eleventh cause of action in the amended complaint, plaintiff alleges that Burlington and R–H failed to perform under their contract with the plaintiff and the other class members. (D.I. 7 at ¶¶ 70–74.) In her twelfth cause of action plaintiff claims that the actions of El Paso and the individual defendants constituted wrongful interference with the contractual relationship between Burlington and R–H on the one hand, and plaintiff and the other class members. (D.I. 7 at ¶¶ 75–78.) Be-

cause these two claims are common law contract and tort causes of action, they are before this Court based upon the doctrine of pendent jurisdiction.

However, this Court has dismissed the Williams Act claims, which are the only ones conferring subject matter jurisdiction upon this Court. As a result, the pendent contract and tort claims will also be dismissed. The Supreme Court in *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966), instructed: "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *See also Walck v. American Stock Exchange, Inc.*, 687 F.2d 778, 792 (3d Cir. 1982); *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 195–96 (3d Cir.1976).

### III. CONCLUSION

In summary, the Court will dismiss causes of action numbered 1, 5 and 10 because those claims have been abandoned by plaintiff on the authority of the *Schreiber* case.

Causes of action numbered 2, 3, 4, 6, 7 and 9 will be dismissed for failure to state a claim under the Williams Act.

Causes of action numbered 11 and 12, the pendent state claims, will also be dismissed since the federal claims on which they are based were dismissed.

Defendants' motion for attorneys' fees will also be denied.[13]

An order will be entered in accordance with this opinion.

---

**13.** Although the defendants' motions to dismiss will be granted, the defendants have requested the Court to award them their costs and attorneys' fees in litigating their motions to dismiss. (D.I. 15 at 24.) Under the American Rule, every party to a case bears its own attorneys' fees and a court will not ordinarily assess such fees except to the extent that the assessment is specifically authorized by Congress. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *F.D. Rich Co. v. Industrial Lumber Co.*, 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974). An exception is made when a party has "acted in bad faith, vexatiously, wantonly or for oppressive reasons." *Hall v. Cole*, 412 U.S. 1 (1973). For

there to be a finding of "bad faith" there must be a clear showing that the claims are made "entirely without color *and* made for reasons of harassment or delay or for other improper purposes." *Browning Debentures Holders' Committee v. DASA Corp.*, 560 F.2d 1078, 1088 (2d Cir.1977). *See also Nemeroff v. Abelson*, 469 F.Supp. 630 (S.D.N.Y.1979), *aff'd in part, reversed in part*, 620 F.2d 339 (2d Cir.1980), *on remand*, 94 F.R.D. 136 (S.D.N.Y.1982), *aff'd*, 704 F.2d 652 (2d Cir.1983).

In the present action, there is no showing that the plaintiff by bringing this action acted in bad faith, vexatiously, wantonly or for oppressive reasons. Accordingly, defendants' motion for attorneys' fees and costs will be denied.