**Bertram FIELD, Plaintiff,**

**v.**

**Julius TRUMP, Eddie Trump, Stuart M. Sloan, Samuel N. Stroum, M. Lamont Bean, Fenwick Crane, E. Ronald Erickson, Calvin Hendricks, Robert B. Hutchinson, Earl W. Smith, Raymond C. Swanson, Pay 'N Save Corporation, The Trump Group, Ltd., NLAC Corp., Acquicorp, Inc., Mergicorp, Inc., TGAC Corp., and TG Limited, Defendants.**

**No. 84 Civ. 7913 (GLG).**

United States District Court,
S.D. New York.

June 3, 1987.

---

Tenzer, Greenblatt, Fallon & Kaplan, New York City (William Klein, II, P.C., of counsel), for plaintiff.

Skadden, Arps, Slate, Meagher & Flom, New York City (Thomas J. Schwarz, Thomas R. deRosa and Roselyn R. Bar, of counsel), for Stuart M. Sloan and Samuel N. Stroum.

Fried, Frank, Harris, Shriver & Jacobson, New York City (Michael H. Rauch, Terrence A. Corrigan and Sandra M. Lipsman, of counsel), for Fenwick Crane, Robert B. Hutchinson, Earl W. Smith, Raymond C. Swanson and Pay 'n Save Corp.

Parker Chapin Flattau & Klimpl, New York City (Joel M. Wolosky and Charles W. Stotter, of counsel), for Julius Trump, Eddie Trump, M. Lamont Bean, E. Ronald Erickson, Calvin Hendricks, The Trump Group, Ltd., NLAC Corp., Aquicorp, Inc., Mergicorp, Inc., TGAC Corp., and TG Ltd.

## OPINION

GOETTEL, District Judge.

This putative class action [1] arises from a leveraged buy-out of Pay 'n Save Corporation (the "Company"). The plaintiff here alleges that in connection with this transaction, the defendants violated various federal securities laws, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 to 1968 (1982 & Supp. III 1985), and the common and statutory law of the State of Washington. All of the defendants except the Company have moved to dismiss the amended complaint, pursuant to Fed.R.Civ.P. 12(b)(6) and 12(b)(1). Defendants Crane, Hutchinson, Smith, and Swanson have moved to dismiss pursuant to these Rules as well as Fed.R. Civ.P. 9(b).

### BACKGROUND

The pertinent facts, as alleged by the plaintiff, are as follows. On or about January 27, 1984, the Company acquired Schuck's Auto Supply from the defendants Stroum and Sloan in exchange for approximately 18.4 percent of the outstanding shares of the Company, worth approximately $70 million.

Thereafter, differences arose between these defendants and the board of directors of the Company, concerning the management of the Company. On March 30, 1984, an agreement was reached between the Company and Stroum and Sloan (the "Standstill Agreement"). Pursuant to this agreement, Stroum and Sloan were made Company directors, and in return agreed, *inter alia*, that for one year they would not sell or otherwise dispose of their shares, or offer to acquire the Company, except as provided in the agreement. At the same time, however, the defendant directors Bean, Erickson and Hendricks acted to render Stroum's and Sloan's directorships powerless.

---

1. By order dated January 13, 1987, the plaintiff's motion for class certification was deemed withdrawn, subject to being renoticed when it might appear that the motion could be properly heard.

During the Spring of 1984, the Company, without the knowledge of Stroum or Sloan, sought a friendly suitor with whom to negotiate the possible sale or merger of the Company.[2] On or near August 31, 1984, the "Trump defendants"[3] proposed a $22 per share tender-merger-leveraged buy-out with defendants Bean, Erickson and Hendricks, as well as nine other senior officers of the Company. Trading in the Company's shares was thereupon stopped, at which time Sloan and Stroum first learned of the Trump proposal.

Negotiations between the Trumps and the Company were made difficult by the stance of Sloan and Stroum, with whom the Trumps were unable to reach an agreement. Although Sloan and Stroum were willing to support the Trumps if the proposed price per share were increased by several dollars, the offered price was raised only to $22.50 per share. Over the dissent of Stroum and Sloan, the Board approved the proposal at this price, and a merger agreement and option agreement for 4,100,-000 shares were executed. On the morning of September 7, 1984, the Company issued a press release announcing the Board's actions and that a tender offer at $22.50 per share was expected to begin in the next few days.[4]

Thereafter, negotiations continued between the Trumps and Stroum and Sloan. On September 12, 1984, the Trumps informed the Company that to facilitate the negotiations with Stroum and Sloan, they were going to withdraw their previously announced tender offer. Later that day, the Trumps issued a press release announcing both the withdrawal, and the continuing negotiations with Stroum and Sloan.

On the same day, the Trumps, and Stroum and Sloan, entered into an agreement (the "Settlement Agreement"), pursuant to which the Trumps agreed to amend the merger agreement to provide for an increased tender price of $23.50 per share, and Stroum and Sloan agreed to grant the Trumps an option to purchase their shares. The agreement further provided that the Trumps would pay Stroum and Sloan $3.3 million for the option, and $900,000 for fees and expenses.[5]

The following day the Board approved the amendment to the merger agreement, and the Company and the Trumps promptly announced that fact and that a new tender offer would commence by September 19, 1984.

## DISCUSSION

### I. Count I

Based on these allegations, the plaintiff claims, in Count I, that the $4.2 million

---

**2.** The plaintiff complains of the fact that the Company did not approach Stroum or Sloan as potential acquirers, notwithstanding the fact that the Standstill Agreement was still in effect and notwithstanding that such a course of action would have been incongruous with management's alleged "obsession" with eliminating Stroum and Sloan.

**3.** The Trump defendants ("Trumps") include defendants Julius and Eddie Trump, and the following defendant companies which are alleged to be owned and controlled by them and through which the merger agreements were executed: NLAC Corp., Mergicorp, Inc., Acquicorp, Inc. and TG Limited. *See* Amended Complaint at 8, ¶ 9.

**4.** The amended complaint alleges that Merrill Lynch, the Company's financial advisor, had concluded that an appropriate price per share would be in the "high $20's," and that "a price in the $30's could be justified." The plaintiff also alleges that the defendants Bean, Hendricks and Erickson had discussed with Merrill Lynch a

leveraged buy-out for $25 per share, "which they believed to be at the low end of value but feared that, at $25, they would tip off the true value of [the Company]." Finally, the plaintiff alleges that in a press release issued on September 7, 1984, Stroum and Sloan described $22.50 per share as "skimpy."

**5.** Although the parties concur that under the Settlement Agreement the total amount which Stroum and Sloan received was approximately $70 million, they disagree over how to properly characterize this amount. The defendants maintain that the $70 million represents $23.50 per share plus $4.2 million for the option and expenses. The plaintiff, however, insists that the $70 million should be viewed in terms of the number of shares held by Stroum and Sloan, *i.e.,* $25 per share. From yet another perspective, the $70 million represents the value of the stock that Stroum and Sloan originally received from Pay 'n Save in exchange for Schuck's Auto Supply, *i.e.,* Stroum and Sloan changed their original stock-for-stock deal to a cash-for-stock deal (but at no greater profit).

received by Stroum and Sloan, denominated as the option price plus expenses, in fact constituted a $1.50 per share premium above the price received by other shareholders, in violation of Section 14(d)(7), 15 U.S.C. § 78n(d)(7) (1982) and Rule 10b–13, 17 C.F.R. § 240.10b–13 (1986). Consequently, the amended complaint seeks the same premium for the approximately 6,000 class members who tendered a total of 11,866,834 shares, or a total of $17,800,251.

### a. Section 14(d)(7)

■ Section 14(d)(7) provides that any person who varies the terms of a tender offer before its expiration, by increasing the consideration offered to security holders, shall pay such increased consideration to each security holder whose securities are taken up pursuant to the tender offer, whether or not such securities have been taken up before the variation.

Defendants argue that there was no tender offer in effect at the time of the Settlement Agreement pursuant to which Stroum and Sloan received the $4.2 million in question, and therefore no violation of Section 14(d)(7). Defendants' reasoning is as follows. Under Rule 14d–2(b), 17 C.F.R. § 240.14d–2(b) (1986), the public announcement of certain material terms of a cash tender offer may be deemed to commence a tender offer. However, a tender offer will not be deemed to have commenced on the date of the announcement of the offer if, within five business days thereof, the offeror issues another public announcement stating that it is discontinuing the offer. *Id.* Therefore, because the offer announced on September 7, 1984 was withdrawn within five business days by public announcement on September 12, there was no tender offer in place at the time of the Settlement Agreement, and thus, as a matter of law, no violation of either Section 14(d)(7) or Rule 10b–13.

The plaintiff responds by arguing that the withdrawal was a "sham," concocted to skirt the strictures of the Williams Act and allow Stroum and Sloan to secure a higher price than other shareholders. In keeping with the invective tenor of his complaint, the plaintiff uses the word "sham" somewhat indiscriminately. Although he derides the parties' motives, he does not explain on what basis we may properly characterize the withdrawal as a "sham" for purposes of Section 14 or Rule 10b–13, and we see none.

First, the plaintiff does not allege that anything in the first announcement on September 7 in any way prohibited the termination of the announced offer, nor that the Trumps were otherwise restricted from withdrawing their offer.[6] This lack attenuates the plaintiff's claim that the withdrawal was a sham. *See Brill v. Burlington Northern, Inc.,* 590 F.Supp. 893 (D.Del. 1984). In *Brill, supra,* the plaintiff based her allegations of Section 14 violations on a similar argument that the "new" tender offer was merely a "guise." However, because the original offer was terminable, the *Brill* court found that there were two separate offers, notwithstanding that, *inter alia,* the second offer was made the day after the first was withdrawn, the price of the two offers was the same, and the new offer was made before the tendering shareholders had received back their tendered shares. *Brill, supra,* 590 F.Supp. at 898–99.

Moreover, there is no legal justification for labelling the withdrawal a "sham" merely because the Settlement Agreement was reached shortly after the withdrawal. "[N]either the [Williams] Act nor any SEC rule promulgated thereunder prohibits a former tender offeror from purchasing stock of a target through privately negotiated transactions immediately after a tender offer has been terminated." *Hanson Trust PLC v. SCM Corp.,* 774 F.2d 47, 60 (2d Cir.1985).

---

**6.** The plaintiff does argue that because the announcement did not terminate the merger agreement, and because the merger agreement contained an "offer provision," the announcement did not effect a withdrawal of the offer. This reasoning is fallacious. Although the merger agreement obligated NLAC (a Trump company) to *commence* an offer, the viability of that obligation has no bearing on whether there was in fact an offer in effect.

### b. Rule 10b–13

■ Rule 10b–13 provides that except in certain circumstances not applicable here, [n]o person who makes a cash tender offer ... for any equity security shall, directly or indirectly, purchase, or make any arrangement to purchase, any such security ... otherwise than pursuant to such tender offer ... from the time such tender offer ... is publicly announced or otherwise made known by such person to holders of the security to be acquired until the expiration of the period ... during which securities tendered pursuant to such tender offer may by the terms of such offer be accepted or rejected....

17 C.F.R. § 240.10b–13 (1986).

The defendants argue that there is no violation of Rule 10b–13, for several reasons. First, they apply the same analysis by which they argued that there was no Section 14(d)(7) violation, *i.e.*, because they withdrew the offer by public announcement within the statutory period, no tender offer was in effect at the time of the Settlement Agreement. Although this argument has some appeal, Exchange Act Release No. 16384 casts doubt on its viability. In that Release, the Securities Exchange Commission stated that the Rule 14d–2 provision, which provided that the second public announcement would prevent the first announcement from being deemed the commencement of a tender offer, applies only to Section 14(d), and not to Rule 10b–13. Exchange Act Release No. 16384, Fed.Sec. L.Rep. (CCH) ¶ 82,373 at p. 82,583 n. 12 (Nov. 29, 1979). In other words, although pursuant to Rule 14d–2 a second announcement may withdraw the tender offer, *nunc pro tunc*, for purposes of Section 14(d), it will not do so for purposes of Rule 10b–13.

■ The defendants' second argument is that the primary purpose underlying Rule 10b–13 is not implicated in this case.

The object of Rule 10b–13 is two-fold. First, it safeguards the interests of security holders who have already tendered their securities and are unable to withdraw them in order to obtain the advantage of possible resulting higher market prices. Second, it protects the tender bidder by removing the incentive of holders of substantial blocks of securities to demand higher consideration than that currently offered to public investors. *See* statement of Orval L. DuBois, Secretary, Securities and Exchange Commission, Exchange Act Release No. 8712, 34 Fed.Reg. 15838, 15838–15839 (Oct. 15, 1969).

Neither of these purposes is implicated here. As to the first, the plaintiff does not allege that any tendering shareholder was prevented from withdrawing his shares to take advantage of possible higher market prices. Indeed, if any tender offer was in effect at the time of the Settlement Agreement, it was the $22.50 offer, and according to the amended complaint, no tender was honored at that price.[7] Nor does the plaintiff allege that there were market prices to be taken advantage of which were higher than either tender.

As to the second purpose, the plaintiff is an improper party to invoke Rule 10b–13 for that reason. If the tender bidder was injured by the incentive of substantial shareholders to demand higher consideration for their shares, it is for that bidder, here the Trumps, to complain, and not a shareholder.[8]

Moreover, the relief sought by the plaintiff, namely, the payment of the alleged premium to all the other shareholders, is inconsistent with underlying purposes of Rule 10b–13. First, nothing in either the Rule or Exchange Act Release No. 8712, *supra*, indicates that the Rule was intended to obtain for tendering shareholders the premium procured by substantial shareholders, but only to assure tendering share-

---

**7.** The defendants argue that in fact no shareholder tendered under the $22.50 offer, nor could one have, because the press release which allegedly commenced the offer did not provide instructions on how or where to do so.

**8.** Nor does the possibility that the Company may have been injured make the plaintiff a proper party to allege a Rule 10b–13 violation. The plaintiff has specifically eschewed bringing a shareholder's derivative action. *See infra* p. 13.

holders access to possible higher market prices.

Second, the requested relief would not protect the tender bidder from the advantage held by substantial shareholders, but would conversely extend such advantage to all the shareholders. Therefore such relief would not serve the underlying purpose of the Rule, but rather exacerbate a problem it was intended to relieve.[9]

## II. Count II

In Count II, the plaintiff alleges violations of Sections 10(b), 14(a), and 14(e), respectively 15 U.S.C. §§ 78j(b) (1982), 78n(a) (1982), and 78n(e) (1982). The plaintiff also alleges violations of Rules 10b–5 and 14a–9, respectively 17 C.F.R. §§ 240.-10b–5 (1986) and 240.14a–9 (1986).

■ The plaintiff bases these claims on allegations that in various documents and press releases, the defendants failed to disclose, *inter alia*: (a) the directors' failure to take certain steps which might have maximized value for the shareholders; and (b) the directors' objective to eliminate Stroum and Sloan, the steps taken to implement this objective, and the fact that they pursued it without regard to either cost or its effect on the Company's business. Count II also recites various failures of the board which allegedly resulted in the Company's unadvisedly entering into the Merger Agreement, and in the shareholders' receiving less for their shares than they might have.[10]

■ The thrust of Count II is thus a claim for breach of fiduciary duty and a claim for failure to disclose such breach, neither of which states a claim under Section 10(b), Section 14(a), or Section 14(e). *See Data Probe Acquisition Corp. v. Datatab, Inc.,* 722 F.2d 1, 4 (2d Cir.1983), *cert. denied,* 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984) (Sections 10(b) and 14(e)); *Maldonado v. Flynn,* 597 F.2d 789, 796 (2d Cir.1979) (Section 14(a)); *Panter v. Marshall Field & Co.,* 646 F.2d 271, 288 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981) (plaintiff cannot bootstrap a fiduciary duty claim into a federal securities action by alleging nondisclosure of the culpability of defendants' acts or motives).

## III. RICO

In Count III, the plaintiff alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 to 1968 (1982 & Supp. III 1985).

■ Section 1962, the heart of RICO, is properly invoked only when the prohibitions contained therein[11] are violated through a "pattern of racketeering activity." We need not reach the issue of whether the plaintiff has sufficiently pled the predicate acts of racketeering, because we find that he has not sufficiently alleged a "pattern" of any such racketeering activity.

9. Finally, the defendants argue that the payment of the $4.2 million did not violate federal securities laws because those laws do not prohibit the payment of a premium. The several cases cited in support of this proposition are inapposite insofar as they do not address the issue of the payment of a premium during the pendency of an alleged tender offer.

10. Although the terms of the Settlement Agreement, and the monies received thereunder by Stroum and Sloan, were disclosed, the plaintiff also complains in Count II that it was not "disclosed" that if the $70 million which Stroum and Sloan received under the Settlement Agreement were divided by the number of their shares, one reached a figure of $25 per share. See footnote 4, *supra.* This claim is frivolous. As the plaintiff admits, it didn't take him long to make a similar computation himself. Plaintiff's

Affidavit in Support of Class Certification at 2. In order to sufficiently disclose material facts, it is not required that stockholders be addressed "as if they were children in kindergarten." *Koppel v. Wien,* 575 F.Supp. 960, 969 (S.D.N.Y. 1983), *rev'd in part on other grounds,* 743 F.2d 129 (2d Cir.1984) (citation omitted).

11. Section 1962 prohibits four types of activities. Section 1962(a) prohibits the investment of income derived from a pattern of racketeering activity in any enterprise whose activities affect interstate commerce. Section 1962(b) forbids the use of racketeering tactics to acquire or maintain control in an enterprise. Activities which affect foreign or interstate commerce may not be used in a pattern of racketeering activity under Section 1962(c), and Section 1962(d) makes it unlawful to conspire to violate Section 1962(a), (b), or (c).

The plaintiff alleges that the preparation and dissemination of allegedly fraudulent documents, including the offer to purchase, the 1984 proxy statement, and the press releases, as well as the other allegedly wrongful acts complained of, constitute a pattern of racketeering activity. We disagree. These multiple acts were simply a series of events necessary to achieve a single objective, namely to take the Company private. "[A] single scheme, though comprised of numerous predicate acts, will not suffice to establish a pattern for the purposes of RICO." *Richter v. Sudman,* 634 F.Supp. 234, 239 (S.D.N.Y.1986) (Goettel, J.).

Moreover, the plaintiff has made no allegation that the alleged scheme is on-going or that it threatens to continue; apparently the alleged scheme ended when the transactions were completed and Pay 'n Save became a privately held company. For this reason also, the amended complaint fails to plead a "pattern" of racketeering activity. *Richter, supra,* 634 F.Supp. at 240. Because the plaintiffs have failed to plead a pattern of racketeering activity, their RICO claims must be dismissed.

IV. State Law Claims

Because we must dismiss the plaintiff's federal claims, we decline to exercise pendent jurisdiction over his state-law claims. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139–40, 16 L.Ed.2d 218 (1966); *Mayer v. Oil Field Systems Corp.,* 803 F.2d 749, 756–57 (2d Cir.1986).

CONCLUSION

Normally, the granting of a motion to dismiss a complaint is made subject to allowing the plaintiff to replead. Such a course is inappropriate here. First of all, these motions to dismiss are directed against an already amended complaint, which was filed after the plaintiff had the benefit of extended discovery and thus presumably had a full grasp of the pertinent facts.

Nor should we allow the plaintiff to replead in order that he might assert a derivative action on the corporation's behalf. The plaintiff has for some time been aware that a possible derivative action could be asserted, but has intentionally eschewed such an opportunity, preferring to reach for the much larger damages which the successful maintenance of this suit might have produced.

For these reasons, we grant the motion to dismiss, without leave to replead.

SO ORDERED.